## Marks's Appeal.

Argued October 3, 1935.

Before KELLER, P. J., BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Anne X. Alpern,* First Asst. City Solicitor, with her *William D. Grimes,* City Solicitor, for appellant.

182

*D. C. Jennings,* for appellee.

OPINION BY KELLER, P. J., February 28, 1936:

The appellant, Dr. P. E. Marks, is Superintendent of the Bureau of Infectious Diseases of the City of Pittsburgh. In an action of assumpsit, brought by a beneficiary under a life insurance policy, pending in the County Court of Allegheny County, he was served by the insurance company defendant with a subpoena duces tecum requiring him to produce the records of his department or bureau relative to Martin Weitzel, the assured in said policy. Dr. Marks appeared in court pursuant to the subpoena, but, on the advice of the City Solicitor, refused to produce the 'records' of his department or bureau, "showing when Martin Weitzel was reported as being tubercular", or "the first time the Health Department became cognizant of the fact that Martin Weitzel was suffering from tuberculosis", because to do so would be against public policy. The City Solicitor also appeared and stated that he had advised Dr. Marks that it would be against public policy to produce the records; that it had been the consistent practice of the department to refuse to divulge any information contained in said 'records'. Counsel for plaintiff joined with counsel for defendant in requesting that the records be produced, but the witness, claiming that to do so would interfere with the work of the Department of Health and be contrary to the public interest, on the advice of the City Solicitor, refused to produce the records in court. The court adjudged the witness to be in contempt of court and sentenced him to pay a fine of $25 and ordered him to be committed to the Allegheny County jail until he had purged himself of the contempt. Dr. Marks appealed to this court. We think the court erred in adjudging the witness in contempt and that the judgment should be reversed.

So far as we have been able to discover the precise question involved has not previously come before an appellate court in this Commonwealth. It has been presented to the Department of Justice—or the Attorney General's Department—on several occasions and the ruling of that Department has been consistently to the effect that the production of such records of the Department of Health would be contrary to the public interest and against public policy. On November 23, 1917 in response to a request of the Chairman of the Workmen's Compensation Board asking whether the records of State dispensaries under the control of the Department of Health must, on subpoena duces tecum, be produced before the Referee, and whether the doctors in charge of such dispensaries could be required to testify to matters within their knowledge, acquired within the line of their duties, Deputy Attorney General William M. Hargest—now President Judge of the Courts of Dauphin County—acting for and with the approval of Attorney General Francis Shunk Brown replied: "The physician in charge of a dispensary of the Department of Health is like any other physician in charge of any other institution. He is subject to subpoena, by a proper tribunal and must obey such subpoena. When he responds he must testify as any other witness to any relevant, competent matter within his knowledge. The fact that this information was obtained through his employment as a physician in charge of a State institution does not render him exempt from testifying, or seal his lips as to the knowledge which he has obtained. I know of no statute which excuses the physician in charge of a State dispensary from testifying as to such facts. The production of records of the Department of Health is quite a different matter. These records are made by reports and it may not be for the best interest of the State, or the Health Department, to have records of this character submitted in

any litigated case in which they are called for, and heretofore the courts have decided that such records cannot be demanded where the Department of Health protests against their exhibition. But the record is not the best evidence of the condition of a man alleged to be sick or injured. The record is simply the report of an examination. The party who made the examination may be subpoenaed and required to testify as to the results of such examination, and such testimony is better evidence than the record would be in the absence of the party who made it. I am, therefore, of the opinion that a Workmen's Compensation Referee may not require the production of the records from the Department of Health, if the Department of Health regard it as improper to produce such records, but that the doctor who made the examination, whether he be the Medical Inspector of a dispensary or not, must testify to relevant facts within his knowledge, even though such facts were obtained in his capacity as a physician in the employ of the Department of Health". See Opinions of the Attorney General, 1917-1918, p. 424, 27 Dist. R. 510.

Again, in 1923, while the Honorable George E. Alter was Attorney General, the Deputy Commissioner of Health inquired for advice as to whether the Department of Health was required to produce medical records of patients at State clinics or State sanatoria when subpoenaed so to do by a court of record within the Commonwealth. The Attorney General, through one of his deputies [1], after an extensive examination of the authorities [2] advised that "where officers of your de-

---

[1] The Honorable Sterling G. McNees.

[2] Including Gray v. Pentland, 2 S. & R. 23, which ruled that the Governor could not be required to produce in court a writing containing charges against an officer of his appointment, and that parol evidence of its contents could not be given; Hartranft's App., 85 Pa. 433, where the Supreme Court reversed the Court of Quarter Sessions of Allegheny County, which had issued

partment, being a branch of the executive authority of the State government, are subpoenaed to appear and bring with them certain confidential records procured solely in their official capacity, you shall judge, in the first instance, whether or not the production of such records would be inimical to the public welfare; that, having so determined, you shall act accordingly, and if, in your judgment, such records should not be produced, you should make respectful presentation to the court of your opinion in the matter, expressly disavowing any disrespect for the dignity and authority of said court, but setting forth your conviction that you must determine, in the first instance, from your knowledge of the records, whether or not they are such as should be made public." See Opinions of the Attorney General 1923-1924, p. 187, 2 D. & C. Reps. 725.

The right of the executive officer to determine whether production and publication of the document in his custody would be injurious to the public service was upheld by Chief Baron POLLOCK in the leading case of Beatson v. Skene, 5 Hurl. & N. 838, 852.[3] That case ruled that a judge at Nisi Prius has no power to compel a witness to produce documents connected with affairs of State, if their production would be injurious to the public service; and that the question whether their production would be so injurious must be determined, not by the judge, but by the head of the de-

attachments against the Governor and certain heads of state departments for refusing to appear before the grand jury investigating certain labor riots in 1877 and testify regarding matters which had come to their knowledge in their capacity as civil and military officers and which they deemed contrary to the public interest to disclose; Thompson v. German Valley R. Co., 22 N. J. Eq. 111, which held that the Governor could not be required to produce his official papers and records on a subpoena duces tecum.

[3] Cited in Hartranft's Appeal, 85 Pa. 433, p. 447, as Beaton v. Skene.

partment having the custody of the documents; for, the Chief Baron said: "The judge would be unable to determine it [that is, the question whether production of the document would be injurious to the public service] without ascertaining what the document was, and why publication would be injurious to the public service— an inquiry which cannot take place in private, and which taking place in public may do all the mischief which it is proposed to guard against."

Practically the same question, as is here presented, came before the Supreme Court of New York in McGowan v. Metropolitan Life Ins. Co., 253 N. Y. Supp. 551, affirmed by the Appellate Division in 255 N. Y. Supp. 131, where "the department of health refused to permit an inspection or examination of ·these records on the ground that to divulge the secret .information contained therein would be a violation of the rule of the department and against public policy." The Greater New York Charter provided, in section 1175 that "The Board of Health may establish .as it shall deem wise, and to promote the public good and public service, reasonable regulations as to the publicity of any of the papers, files, reports, records and proceedings of the department of health; and .may publish such information as may, in its opinion, be useful concerning births, deaths, marriages, sickness, and the general sanitary conditions of said city, or any matter, place or thing therein." Pursuant to the authority thus given by the charter, the board of health prescribed the following regulation: "Regulation 9—Records: A complete and accurate record shall be kept of every case of pulmonary tuberculosis, examined or treated at a dispensary. The Department of Health may require in its discretion regular and uniform statistical reports relating to the examination, care and treatment of all persons coming within the jurisdiction and control of such dispensary. Such records shall not be open to

inspection by the public or to any person other than the representatives of the Department of Health of the City of New York and such persons as may be authorized by law to inspect such records." The court held "(1) that the mere fact that the applicant is a party to an action in which the records in question may be material or relevant to the issues does not make it a person authorized by law to inspect such records within the meaning of the regulation. The purpose of the regulation was to forbid inspection by persons who, on general principles, might be entitled to inspect the records, and to confine such inspection to persons who might be authorized, by special provisions of law, to make it. (2) Nor do we think the regulation, so construed, an unreasonable one. The papers submitted by the department, in opposition to the application, show that some regulation of this sort is highly desirable in the public interest. Persons suffering from contagious or infectious diseases, including sufferers from tuberculosis, must be assured of the greatest secrecy in dealing with their cases before their full co-operation with the public health authorities can be expected. The highly useful work of the department of health might be seriously interfered with, to the prejudice of the community, if its records in such cases were known to be subject to disclosure at the demand of anyone having an interest in learning their contents. ......(3) In the present case the right to waive the statutory prohibition against disclosure on the trial would not exist. The patient who, by the hypothesis, has been treated for tuberculosis is dead and is not represented in the action. Plaintiff sues, not as the representative of the decedent, but in her own right as beneficiary under the terms of the policy." In affirming the lower court, the Appellate Division said: "The appellant says that if it can produce these documents it will be in a position to prove that the deceased

applied for treatment at the board of health. To do so it would be necessary to disclose all the facts which should be kept secret. If the fact that the deceased applied for treatment is admissible, it may be proved by other evidence. To prove that fact by the production of the papers required would necessarily compel a disclosure of the details of the visit of the deceased to the department of health. The reason assigned for the necessity of such disclosure of the official documents of the department of health does not outweigh the importance of keeping the contents of such papers secret. The protection thus afforded the people of the city of New York is of much greater importance than the interests of a litigant in an action of this character."

It is true that, differing from New York, physicians in this State may be required to testify in court relative to the diseases of their patients, subject only to the provision of the Act of June 7, 1907, P. L. 462, that they are not allowed, in a civil suit, to disclose any communications made to them by their patients, which tend to blacken the character of the patient: Phillips' Est., 295 Pa. 349, 145 A. 437; and that there is no explicit regulation of our Deparment of Health providing that the records and reports obtained by it in preserving the public health and protecting it against communicable diseases shall not be open to inspection by the public; but it has been its custom, relying on the advice of the Attorney General, supra, not to allow such public inspection and to refuse to produce records when deemed to be against the public interest. And there is, on the other hand, no express provision in our statutory law that the data or information so furnished to or acquired by the Department of Health shall constitute records open to public inspection or to be furnished the public on demand or request, except in very few instances, and the expression of these few

instances where the records are made public documents would imply the exclusion of the rest. Thus the Act of June 7, 1915, P. L. 900, as amended by Act of May 24, 1933, P. L. 979, providing for the registration of births, deaths and marriages directs that certificates of birth (sec. 14) and certificates of death (sec. 7) shall contain certain information therein set forth in detail and that the State Registrars shall furnish any applicant a certified copy of any birth, death or marriage registered under the Act; and that any such copy of the record of a birth, death or marriage, when properly certified by the State Registrar to be a true copy thereof, shall be prima facie evidence in all courts and places of the facts therein stated. We raised the question in Borgon v. John Hancock Mut. Life Ins. Co., 99 Pa. Superior Ct. 377, 383, 384, whether such certificate was evidence of the *cause* of death, as distinguished from the fact of death. See also, Allegheny Trust Co. v. State Life Ins. Co., 110 Pa. Superior Ct. 37, 40, 167 A. 251; Sitler v. Gehr, 105 Pa. 577, 600.

An examination of the statutes relating to the Department of Health shows two broad general aims and purposes in view: (1) The collection of vital statistics, such as births, deaths, marriages, etc.; (2) the preservation of the public health and the prevention of disease. Data and records received under the first class are gathered for public use and inspection, and the statutes requiring them to be furnished provide that official certificates of the statistics as furnished pursuant to law shall be given to the public on payment of a small fee. With the possible qualification above stated, there is no doubt as to these being 'public documents' or 'official statements'—the latter term being preferred by Professor Wigmore, (Wigmore on Evidence, Vol. 3, sections 1630 and 1642, 2d Ed.)—which are receivable in evidence as a proper exception to the Hearsay rule. But information gathered or received

for the preservation of the public health and the prevention of disease is not always and in all cases designed or intended for inspection by the public. It may be contrary to the public interest to allow it to be made public or open to general inspection. As pointed out in the opinion of the Supreme Court of New York and the Appellate Division of that court in McGowan v. Metropolitan Life Ins. Co., supra, the protection of the health of the community involved in securing full and frank disclosure of important information, not subject to divulgence to the general public, from persons afflicted with communicable diseases, may outweigh in importance the interests of a private litigant in an action of this character. In the absence of statutory pronouncement on the subject, the officer in charge must be allowed to decide what information so received is proper for publication or general inspection and what should be withheld in the public interest. Information furnished or secured for this purpose does not fall strictly within the 'public documents' or 'official statements' exception to the Hearsay rule, and may contain matters which the head of the department, in whose custody or control they are kept, deems injurious to the public interest—in which case, Mr. Greenleaf says: "An inspection will not be granted." [4] See also, Wigmore on Evidence, Vol. 5, sec. 2377, (2d Ed.).

It is true that usually this withdrawal from general inspection of records obtained by public officials is by statutory authority (5 Wigmore, sec. 2377), especially when considered as a *privilege*, but it is not necessarily so. Most of the well established rules of evidence—at least in common law states—are of judicial, not statutory, origin. The Hearsay rule and its exception as respects 'public documents' or 'official statements' are both of judicial origin. Insofar as they are not

---

[4] 1 Greenleaf on Evidence, sec. 476.

affected or limited by statutory regulation, they remain judicial in character, and where it is required in the public interest, it is the province of the authority which created them to construe and apply them. The decisions of the Supreme Court in Gray v. Pentland, 2 S. & R. 23 and Hartranft's Appeal, 85 Pa. 433, were not based on statutory authority, but were applications of rules of judicial origin to new circumstances.

The records of public officials relative to the report to them of communicable diseases or the treatment by them of persons suffering from such diseases are not 'primary' evidence or the 'best' evidence. They would be excluded under the Hearsay rule, unless they are brought within one of the well established exceptions to that rule. Mr. Justice KEPHART,—now the Chief Justice—, in the case of Paxos v. Jarka Corporation, 314 Pa. 148, 171 A. 468, pointed out that hospital records are not admissible in evidence, "except in extraordinary cases and then only when the three probative elements are present."[5] The General Assembly may provide, as it has done with respect to workmen's compensation cases (Act of June 2, 1915, P. L. 736, Art. IV, sec. 422, as amended by Act of June 26, 1919, P. L. 642, sec. 6, p. 664; 77 PS 835) that the records kept by a hospital of the medical or surgical treatment given an employee shall be admissible as evidence of the medical and surgical matters stated therein. But in the absence of such statutory provision the general rules apply.

Unless the information thus gathered by the Department of Health and its agencies in its efforts to preserve health, and prevent communicable disease constitutes 'public documents' or 'official statements' within

---

[5] (1) They must be made contemporaneously with the acts they purport to relate; (2) at the time of making them it could not be anticipated that a reason might arise for making a false entry; (3) the evidence must be the statement or opinion of one having expert knowledge on the subject.

the meaning of the well-established exception to the Hearsay rule, it is properly excluded, for it is hearsay evidence. As was said by Chief Baron POLLOCK in Beatson v. Skene, supra, "Now it turns out, on referring to the date and nature of the documents called for, that not one of them could have been given in evidence on the trial had they been produced" (p. 852).

We agree with the statement of the Assistant City Solicitor who so ably presented this case on appeal, "These records are in no true sense of the words 'public records'; they are departmental records. To thwart the important functions of the Health Department by placing their confidential data in the hands of the general public would effectively impair the important work performed by this Department in the prevention, control and treatment of infectious diseases. It is earnestly submitted that the interests of the public in protecting itself and those afflicted with dangerous infectious diseases far outweighs any benefit that insurance companies or other litigants might gain by reason of ready access to departmental records." As was said by Baron POLLOCK in Beatson v. Skene, supra, "The general public interest must be considered paramount to the individual interest of a suitor in a court of justice."

As to the power of this court to examine and review orders for commitment for contempt of court, see In re Adjudication of Contempt of Myers & Brei, 83 Pa. Superior Ct. 383, and cases cited therein.

The assignment of error is sustained. The judgment of the court below is reversed and the appellant is discharged.