## Staunton

MARYLAND CASUALTY COMPANY v. THE CLINTWOOD BANK, INC.

September 12, 1930.

Absent, Holt and Browning, JJ.

*Chalkley & Camblos*, for the plaintiff in error.

*W. B. Phipps, John W. Flannagan, Jr.*, and *C. R. McCoy*, for the defendant in error.

PRENTIS, C. J., delivered the opinion of the court.

This is a motion brought under Code 1924, section 6046, by The Clintwood Bank against the Maryland Casualty Company, surety on the bond of William P. Raines, cashier of the bank. There has been a jury trial, a verdict and judgment in favor of the bank for $10,000, the penalty of the bond, and the surety company is here assigning several errors.

The first of these assignments is the refusal of the court to order the removal of the case from the Circuit Court of Dickenson county to the District Court of the United States for the Western District of Virginia, because of diverse citizenship.

The notice of motion was served March 8, 1929, and was returnable before the Circuit Court of Dickenson county March 23, 1929. The general counsel in Virginia of the surety company wrote to the clerk of the court March 19, 1929, asking him to enter their name as counsel for the defendant, and to advise them when the case should be set for trial. On the same date they wrote to the attorney for the plaintiff, advising him that they had written to the clerk to note them as counsel for the surety company, and inquiring of the attorney for the plaintiff when he wished to have the case set for trial, stating that they (defendant's counsel) could hardly be ready during that term, and suggesting a continuance to the next term. Attorneys for the plaintiff replied that they would be willing to have the case passed until April 2, 1929, a later day in the term, and enclosed a copy of an order which they stated would be entered, and requesting defendant's counsel to wire whether or not the order would be satisfactory. There was no response to this letter, and on the 23rd day of March, the return day of the notice, defendant not having either demurred, pleaded or answered, an order was entered docketing the case and continuing it until April 2, 1929. This order was entered upon motion of the attorneys for the plaintiff. In the meantime, however, general counsel for the surety company in Virginia wired to the plaintiff's attorney advising him that Hon. John W. Chalkley would represent the Maryland Casualty Company and to telephone him. The attorney for the plaintiff was unable to communicate with Mr. Chalkley, and on March 23rd, after the order of continuance had been entered and court had adjourned, a petition was filed with the clerk, praying for the removal. This petition, however, was invalid because there had been no notice to plaintiff or its attorneys, and was abandoned. Thereafter, April 1, 1929, the surety company, by its counsel, appeared in court and

filed another petition for removal, which was denied, the court holding that it was filed too late. The correctness of this ruling is the question raised by the assignment.

We observe that under the Virginia motion statute, Code 1924, section 6046, the plaintiff may take judgment on the return day if the defendant fails to appear, and that no plea in abatement can be received after the defendant has demurred, pleaded in bar, or filed a statement of its grounds of defense.

We find in 3 Cyc. 504, this statement: "Service of a notice of general retainer or appearance, or filing such notice with the clerk after a complaint has been filed, constitutes a general appearance in actions at law." And this also:

"*Acts Recognizing Case as in Court—In General.*— Any action on the part of defendant, except to object to the jurisdiction, which recognizes the case as in court, will amount to a general appearance."

These statements of the general rule are well supported by the cases.

The precise question raised is controlled by the Federal statute, section 29 of the Judicial Code (28 U. S. C. A., section 72). By the provisions of that section, the removal petition must be filed "in such State court at the time, or any time before the defendant is required by the laws of the State or the rule of the State court in which such suit is brought to answer or plead to the declaration or complaint of the plaintiff."

We find this in Dobie on Federal Procedure, section 109, page 429, referring to the practice in States which prescribe a different time for filing pleas in abatement and pleas to the merits: "An interesting question then arises, in these States, when the removal petition is filed in the State court after the lapse of the time for filing pleas in abatement, but before the expiration of the period within which pleas to the merits may be filed.

"This point was discussed in the leading case of *Martin* v. *Baltimore & Ohio Railroad Co.*, 151 U. S. 673, 14 S. Ct. 533, 538, 38 L. Ed. 311. The decision there reached was that the removal petition was filed too late. The court held that, inasmuch as the language of the Federal statute made no distinction between different kinds of answers or pleas, 'Congress contemplated that the petition for removal should be filed in the State court as soon as the defendant was required to make any defense in that court, so that, if the case should be removed, the validity of any and all of his defenses should be tried and determined in the Circuit Court of the United States.' " The language last quoted is from the opinion.

This decision was followed in *Fidelity and Casualty Co.* v. *Hubbard* (C. C. Va., 1902), 117 Fed. 949. There is a note on this case in 8 Va. Law Reg. 414.

In *Kansas City, Fort Scott & Memphis R. Co.* v. *Daughtry*, 138 U. S. 298, 11 S. Ct. 306, 34 L. Ed. 963, the previous statute is also construed, and it is held that "application to remove a cause from a State to a Federal court must be made at or before the time when the plea therein is due, and the time for removal cannot be extended because a plaintiff in error does not take advantage of his right to take judgment by default."

In Simkins Federal Practice, page 1066, this is accepted as the settled practice, and he cites in addition to the case just cited *Austin* v. *Gagan* (C. C.) 39 Fed. 626, 5 L. R. A. 476; *Fox* v. *Southern R. Co.* (C. C.) 80 Fed. 945; *Heller* v. *Ilwaco Mill & Lumber Co.* (C. C.) 178 Fed. 111, 112.

■ That the State court should not surrender its jurisdiction on a petition for removal unless a case is made which on the face of the record shows that the petitioner has a right to such removal is also well recognized. *Stone* v. *South Carolina*, 117 U. S. 430, 6 S. Ct. 799, 29 L. Ed. 962; *Home Ins. Co.* v. *Morse*, 20 Wall. 459, 22 L. Ed. 370;

*Crehore* v. *Ohio & M. R. Co.,* 131 U. S. 241, 9 S. Ct. 692, 33 L. Ed. 144; Simkins Federal Prac., page 1071.

■ Under the Virginia statute, the plea of the defendant was due March 23rd, the return day. The petition for removal was not filed on that day; on the contrary, the case was ·continued on motion of the plaintiff, for the accommodation of the defendant, and so the petition filed thereafter, April 1st, was filed too late.

The court did not err in refusing to remove the case.

■ Another assignment of error is based upon the refusal of the court to grant another continuance until the next term, June 25th, the motion being made April 1st. Instead of trying the case on April 2d, the date to which it had been continued, the case was passed until April 11th, in order to give counsel for the defendant additional time and opportunity to prepare for the trial.

·The defendant had been notified of the default of the cashier in September, 1928, had been in possession of the proofs of loss filed by the plaintiff for some time, and had made investigations in order to determine its liability under the bond. There is no suggestion that had more time been given for the preparation of the case any additional fact could or would have been adduced. We are clear in our view that the trial court did not err in overruling the motion for a further continuance.

The attorney for the surety company clears the case for the decision of the only substantial question which the record discloses by this statement in his petition for the writ of error: "Plaintiff abundantly proved on the trial a sufficient number and amount of these losses to exceed the sum of $10,000" (this being the penalty of the bond). "No defense is here made on that account, and it will be wholly unnecessary for the court to consider any of the proof establishing or tending to establish the several losses incurred by the defendant. It is unfortunate that an

agreement could not be reached to eliminate this vast amount of evidence from the record."

The bond was executed by the surety company and was given to indemnify the bank for losses which might be sustained by reason of any act or acts of fraud, dishonesty, forgery, embezzlement, wrongful abstraction or wilful misapplication on the part of the employee, Raines, while in the performance of his duties as cashier in the service of the employer bank and occurring during the continuance of the bond. Among the conditions was this: "That if the employer becomes aware of the employee committing any act of fraud or dishonesty, or of the employee gambling or speculating or committing any disreputable, lewd or unlawful act, the employer shall within ten days thereafter notify the company by registered letter, addressed to the company at its home office in Baltimore, Maryland, and the company shall not be liable for any loss subsequently incurred by the employer through any act of the employee unless the company shall have consented, in writing, to continue its liability under this bond."

The main defense is based upon the avertment by the surety company that the bank, though knowing of the fraud and defalcations of its cashier, failed to give it the notice within ten days as required by the conditions just quoted. This, of course, is a question of fact. The record is so voluminous and the circumstances relied on to show this failure to give timely notice are so involved with the other evidence in the case, that it is exceedingly difficult even to summarize it.

It is shown that during almost the entire period of the cashier's service, the State Corporation Commission, through its chief bank examiner, frequently called the attention of the bank, through letters addressed to it, to its unsatisfactory banking methods. There is, however, nothing in any of these letters, save the latest, that of August 6, 1928, to

indicate that the State officials were charging the cashier with dishonesty or the misappropriation of the bank's funds. Certain corrections were made and investigations had which seemed to exonerate the cashier. The president and directors of the bank testified with great positiveness that they had perfect confidence in Raines, the cashier, and did not doubt either his capacity or his integrity until thereafter, in September, 1928, when their attention was directed to certain entries, which upon a prompt investigation they found to be false, and when they discovered this they on September 17, 1928, and within ten days after they became aware of his dishonesty, notified the defendant surety company. This main issue of fact was submitted to the jury upon proper instructions, and their verdict against the surety company is well supported by the testimony for the bank. This is conclusive here unless some harmful error of law was committed during the trial.

It is claimed that a number of harmful errors were committed. One of these errors is thus stated: "The court erred in rejecting one of defendant's pleas, and in striking from the other two material and proper defenses interposed therein." This point, which is based upon rulings as to the three separate pleas and shown by three separate bills of exception, so far as we are able to state from the record, seems to be this: There is a provision in the bond that the employer and the surety company "shall share any recovery (excluding insurance and reinsurance) made by either on account of any loss in the proportion that the amount of the loss borne by each bears to the total amount of the loss." This trio of pleas consists of one which alleges that the bank recovered from the employee a large amount of real and personal property, which it itemizes, the largest item being the residence of the defaulting cashier, alleged to be worth, over all incumbrances, $5,500. These items of property seem to represent property of the bank cashier

which he conveyed to the bank in part settlement, not of his defalcations, but of his debts due to the bank.

The court struck this portion of the plea out, because of opinion "that the defenses made in said words and figures set out could not be made in this case, but that a new action, if the defendant were so advised, should be brought to protect defendant's rights and interests, if any it had in that respect," and struck from said plea and grounds of defense the foregoing words and figures as a part thereof.

Another is a plea of *non est factum*, which was rejected because it was not properly verified. Then there is the third plea which alleges, in substance, that by reason of the failure to notify the surety company promptly of the default of the cashier, it sustained $12,000 damages, which it offered to offset against the amount, if any, due under the bond.

The court refused to permit the filing of the plea, struck out so much of it as referred to the conveyances of property alleged to have been made by the cashier to the bank as constituting any defense to this action, but permitted the other part of the plea to be filed as additional grounds of defense.

The relevancy of this is so obscure, and its application to the case so difficult to understand after being stated, that we leave it in the same obscurity in which the attorney for the defendant left it. If there be error in the ruling, it is insufficiently assigned and violates Rule XXII. The necessity for filing these obscure and complicated pleas is not apparent. The defense that the plaintiff could not recover upon the bond because it had not given the required notice is clear enough, and the right to establish that defense by testimony was not denied. This was all the defendant was entitled to under the facts shown in this case. Whether or not, after the plaintiff established its claim to indemnity and recovered judgment under the bond,

then if the plaintiff thereafter should collect from the cashier any portion of that loss for which it had recovered of the surety company, of course the defendant would be entitled to credit therefor. That, however, is an entirely different question from any here properly in issue, which can be hereafter settled upon proper pleadings and proof. It appears from Bill of Exception No. 12 that the property of the defaulting cashier referred to was conveyed to pay debts due from him to the bank, and hence had no relation to his speculations which were the subject matter of this case.

The court was right in declining to allow the actual issues in this case to be so beclouded. Those issues were (1) whether there had been a defalcation by the cashier not covered by his conveyances of property to the bank; and (2) whether or not the surety company was liable therefor under the indemnity bond.

■ ■ There is another assignment of error which is thus stated: "The court committed error in treating certain letters and reports of examination of the banking division of the State Corporation Commission as privileged, and in refusing to require M. E. Bristow, Deputy Commissioner of Insurance and Banking in the department of the State Corporation Commission of Virginia, to produce said papers which he had with him in court to answer to a *subpoena duces tecum*, and in refusing to require said witness to testify from said papers with reference to issues involved in that case."

The State Corporation Commission, in answer to the *subpoena duces tecum*, said this: "The State Corporation Commission comes and says that its custody, possession and control are in virtue of the Virginia banking act and particularly section 56 thereof, Acts 1928, page 1329, and the State Corporation Commission hereby vouches the provisions of the Virginia banking act and sets forth that it is subject to a privilege and to the paramount provision

of the Virginia banking act, and is not bound to produce the documents, records, letters and written matter directed to be produced by the *subpoena duces tecum*, and it submits to this court the question, and requests an express ruling, as to whether the documents, records, letters and written matter embraced in the *subpoena duces tecum* shall be required to be tendered for inspection."

Section 56, Acts of 1928, page 1330, chapter 507, referred to in this answer, reads: "All records, reports and information .concerning any bank other than those required by law to be public, shall be open only to such officers and employees of the State as may have occasion and authority to inspect them in the performance of their duties, and to any officer or duly authorized agent of such bank, and the imparting of such information by any employee or officer of the State may be sufficient cause for his removal from the position he occupies under State government."

The trial court held that the reports and letters could not be required to be produced by the *subpoena duces tecum*. In this we think it erred. These statutory provisions should be construed to relate to information of a confidential nature affecting the business of a bank. They should be strictly construed, when invoked for the limitation of judicial inquiry, and are subject to the right of every litigant to call for and produce evidence affecting his substantial rights. In a case like this, in which the default of the cashier was manifest, and the question was whether or not the bank had failed to notify the surety company within ten days after knowledge of such default, the surety company had an interest, and the statute was not intended to deny such an essential right as the right to call for witnesses. The latter part of the section prohibiting employees or officers of the State from imparting such information, clearly means the voluntary imparting of such information. It has no reference whatever to the duty of a witness, whether State officer or not, to testify when duly sworn

and examined in court as a witness. Such testimony could not subject the employees of the State Corporation Commission to the penalty of discharge referred to in the act. The evil intended to be forestalled and prevented by this clause of the statute was the voluntary imparting by State employees of information so acquired, injurious to a bank. It was not intended to impede the administration of justice in the courts by the suppression of pertinent testimony.

No substantial injury, however, was committed by the erroneous ruling. The *subpoena duces tecum* asked for—

(1) Copy of letter of criticism and directions written by him (Bristow) or his department to the Clintwood Bank, or some official thereof, after examination of said bank by his department, of January 9, 1925, and the reply thereto;

(2) Copy of letter of criticism or order written by him or his department to the Clintwood Bank, or some official thereof, shortly prior to August 11, 1925, and the reply thereto;

(3) Copy of letter of criticism or order written by him or his department to the Clintwood Bank, or some official thereof, shortly prior to August 14, 1926, and the reply thereto;

(4) Copy of letter written by him or his department to the Clintwood Bank, or some official thereof, shortly prior to February 12, 1927, and the reply thereto;

(5) Reports or copies thereof of all examinations of the Clintwood Bank made by him or his department between January 16, 1925, and September 16, 1928, inclusive, and all correspondence or copies thereof relative to any such examinations or pertaining thereto, between him or his department and the Clintwood Bank, or the officials thereof."

In every single instance, the documents called for by the *subpoena duces tecum* were obtained and introduced. If any were omitted, the diligent attorneys for the surety

company have failed to designate the omission. They seem to be merely relying upon their suggestion that perhaps something has been suppressed, and that perhaps, had Mr. Bristow been permitted to answer the questions, something else might have been developed to strengthen the case of the defendant company. This, of course, is not a reason but is merely a disappointed hope and quite insufficient to justify a reversal of the case.

During the trial, in this connection, this statement by one of the attorneys for the bank appears:

"Mr. Flannagan: The plaintiff has turned over to the defendant all records, books and papers of the Clintwood Bank, including all reports, letters and communications between the Clintwood Bank and the State Banking Department. If the defendant has not found all records it desires from the Banking Department and will furnish plaintiff with a list of same, and plaintiff is unable to supply same from the records of the Clintwood Bank, which have been, as aforesaid, turned over to the defendant, the plaintiff now calls upon the defendant to join with it in a request to the State Corporation Commission of Virginia to send Mr. Bristow to Clintwood on the next train with all records and papers the defendant desires."

The response to this frank tender is this:

"Mr. Chalkley: I thought he was going to make a motion, that is, a motion directed toward the defendant. Now we don't see all those records, and while I don't think him or the court or anybody else can get everything valuable, now I want to say this, I have called for papers we didn't get and I would like for your honor to see the way the correspondence is in that room. There are several drawers and boxes and the floor full of papers and in a day we got some of the State Corporation Commission stuff. We cannot say we have been able to get all that we wanted, the report of those examiners, I don't know, I found several statements."

Colloquy between counsel continued, and ended thus:

"Mr. Chalkley: He is evidently speaking for the purpose of the record. We can't tell him what all the records are I want. He has turned over all the records and he has given us access to the indiscriminate records. I can't point out every record I want from the State Corporation Commission, but we do want the record made by the bank examiners and the letters of his client based on that examination.

"Mr. Flannagan: Plaintiff states that he has turned over to the defendant each and every record of the Clintwood Bank that he knows anything about, and if there is a thing that has not been turned over, I want to know that record right now, and the plaintiff desires to state that the bonding company has had access to the Clintwood Bank since September, 1928."

The president of the bank testified that all the records called for had been produced, and there is no indication in the briefs or in the record that there is any paper in existence which the defendant desired to have which has not been produced. We perceived no reason whatever for prolonging this litigation in order that the defendant may endeavor to find by further search something or other which he does not know is in existence. There is no reason to doubt that all of the letters, papers and reports which have any relevancy to the question at issue have been produced and are in the record. We therefore hold that under the facts shown, the error of the court, committed in restraining the full examination of the Chief Bank Examiner, Mr. Bristow, was harmless.

██ Another assignment of error is that B. M. Lane, one of the jurors in the case, and A. W. Powers, who was a director of the bank, married sisters. The juror had testified that no relationship existed between him and any officer or director of the bank. During the trial, on Friday, April 12th, Powers, the director, was testifying and it be-

came known that he and the juror Lane had married sisters. No objection was made on that day, but on the next day, April 13th, after the court had adjourned for the day, counsel for the defendant called the attention of the judge to the fact, but made no motion relative thereto. The court again convened on Monday, and further testimony was taken. Then on Tuesday, April 16th, the defendant's attorney, for the first time, objected to Lane as a juror.

The defendant fails to show that he was injured by the irregularity, and we think that even had the objection been good originally, the defendant, by withholding his objection for three days during the continuance of the trial, waived it.

Code 1919, section 6001, provides: *"When exceptions to juror not allowed.*—No exception to any juror on account of his age or other legal disability shall be allowed after he is sworn, unless by leave of the court."

Code 1919, section 6002, provides: *"Irregularity cured by verdict.*—No irregularity in any writ of *venire facias* or in the drawing, summoning, returning or empaneling of jurors shall be sufficient to set aside a verdict unless the party making the objection was injured by the irregularity or unless the objection specifically pointing out such irregularities was made before the swearing of the jury; and no judgment shall be arrested or reversed for the failure of the record to show that there was a *venire facias* unless made a ground of exception in the trial court before the jury is sworn."

The statute was cited and construed in the cases of *Allen* v. *Commonwealth,* 122 Va. 846, 94 S. E. 783, and *Norfolk & Western Ry. Co.* v. *Hardy,* 152 Va. 783, 148 S. E. 839, 840.

There is an assignment of error entitled: "Errors committed by the trial court in admitting and rejecting evidence offered."

Ignoring the objection that this assignment is couched in such general terms and that the specifications that appear in the exception are also quite general, it seems unnecessary to us to prolong this opinion by a specific discussion of them. Whether or not, in every single instance, the testimony complained of should have been admitted or rejected is immaterial because there is nothing of substance which could or should affect the result.

Another assignment alleges: "Error committed in giving, refusing and modifying instructions." The specific objection made under this assignment is that the defendant offered an instruction which reads: "The court instructs the jury that it was unlawful for the plaintiff bank to invest in its bank building and premises, including its furniture and fixtures, an amount greater than fifty per cent of its paid in capital stock and its undiminished surplus, and if they believe from the evidence that any officer or director of plaintiff bank, while acting in such capacity, became aware at the time said plaintiff was preparing to build building or acquiring furniture and fixtures for any building or buildings that its cashier, W. P. Raines, was committing a fraudulent or unlawful act in using the funds of plaintiff bank for such purpose in excess of said fifty per cent of its capital and surplus, then the bond sued upon in this case terminated at that time, and the plaintiff having failed to notify the defendant within ten days thereafter, and the defendant not having consented in writing to continue *its on* the bond, then they must find for the defendant as to all loss incurred by the plaintiff there after."

This instruction is based upon Code, Supp. 1928, sections 4149 (30), and 4149 (31), which limit the amount to be invested in bank buildings, furniture and fixtures. The penalty provided for violation is that the directors of the offending corporation shall be individually responsible. The fact is that not only Raines, the cashier, but all of the

other active directors of the bank agreed in making the investment in the bank building. That they violated these statutes is true; that they subjected themselves to the penalty is true; but this has scant relation to the defalcations of the cashier. The evidence shows that the bank has suffered no loss whatever by this unlawful investment. Should the bonds of surety companies be so strictly construed as to relieve them from liability upon every violation of any provision of the banking statutes, even though it does not involve dishonesty and fraud of the employees, then such bonds, in their present form, would afford slight security and fail in their purpose. The matters in the bond about which the surety company was entitled to notice are thus expressed: "That if the employer becomes aware of the employee committing any act of fraud or dishonesty, of the employee gambling or speculating or committing any disreputable, lewd or unlawful act, the employer shall within ten days thereafter notify the company" etc. Clearly this bond was not intended to cover the illegal purchase by the directors for the bank of real estate in excess of the quantity and kind permitted by the statute.

The instructions given for the defendant fully safeguarded every right, and had the jury believed that the directors of the bank had withheld any information from it which it was entitled to have, they would have found in favor of the defendant. The evidence is ample to justify the jury in concluding that they had also trusted the cashier, had themselves been deceived, and had not withheld any such information.

This statement from 3 R. C. L., section 112, pages 484–5, is supported by the case cited: "When the bank is required by the bond to give notice of the defalcation of the principal, this alone does not require the bank to exercise any degree of care in inquiring into and supervising the conduct of the principal to find out whether he has defalcated;

only after knowledge of the principal's defalcation has actually come to the bank does its duty to give the notice arise." *Fidelity & Casualty Co. v. Gate City Nat. Bank,* 97 Ga. 634, 25 S. E. 392, 33 L. R. A. 821, Am. St. Rep. 440.

 "A provision requiring written notice to the obligor of any acts of the cashier involving loss to the bank, to be given as soon as practicable after the bank has knowledge of such act, does not require notice upon mere suspicion, but only after the bank has knowledge of such facts as would justify the charge of fraud and dishonesty against the cashier." *American Surety Co. v. Pauly, Receiver,* 170 U. S. 153, 18 S. Ct. 552, 42 L. Ed. 977.

The frauds of the cashier were cunningly and carefully concealed from the president and directors of the bank and from the bank examiner. The bond was executed for the avowed purpose of indemnifying the bank from the precise wrongs which the cashier committed. If such bonds do not indemnify in a case like this, they "break the word of promise to the hope."

The case has assumed importance only because of the record, which is unnecessarily voluminous, and the ability and persistence of the attorney for the surety company. We have no doubt whatever that the case has been correctly decided upon its merits.

*Affirmed.*