## Commonwealth v. Mellon National Bank and Trust Co.

*T. McKeen Chidsey*, Attorney General, and *Carl Chronister*, Deputy Attorney General, for Commonwealth.

*Snyder, Hull, Leiby & Metzger*, for defendant.

HARGEST, P. J., November 26, 1947.—This matter comes before us on a petition, rule granted thereon, and answer thereto, asking for the issuance of a subpœna duces tecum.

The petition avers that the Mellon National Bank made its report of shares to the Department of Revenue for the year 1934; that it was merged with the Union Trust Company of Pittsburgh under the name of the Mellon National Bank & Trust Company, effective September 23, 1946; that it appealed from the re-settlement of the tax on its shares for the year 1934, and averred that said tax violated section 5219 of the Revised Statutes of the United States, 12 U. S. C. §548, and also violated the provisions of the Act of July 15, 1897, P. L. 292, as amended, 72 PS §1931, in that it discriminated against the shares of the Mellon National Bank and 732 other National banks and National banks and trust companies located in Pennsylvania, (hereinafter called National institutions), in favor of the shares of 251 trust companies and banks and trust companies which were incorporated under the laws

of the Commonwealth and liable to taxation under said laws during the year 1934, and were required to file reports of shares, under the Act of June 13, 1907, P. L. 640, as amended, 72 PS §1991-2011 (hereinafter called State institutions); that the tax imposed on the National institutions was at a greater rate than those imposed on the State institutions whose moneyed capital comes into competition with the business of National institutions; that, in order to prove that petitioner and other National institutions have been discriminated against, petitioner must produce evidence of such discrimination, which can only be obtained from reports and other sustaining documents filed by the corporations with the Department of Revenue by the companies named in the exhibits to the petition, and that the Secretary of Revenue has been requested to supply the data and information and has refused to do so.

Petitioner prays that the court issue subpoenas duces tecum in the form suggested in the petition.

The answer of the Secretary of Revenue admits most of the facts, but denies that the evidence of discrimination can be obtained only from the reports filed with the Department of Revenue, and avers that the evidence can be obtained from the National institutions enumerated, in the form of subpoenas duces tecum, or through authorization by such corporations to petitioners to obtain the information from their tax reports on file in the Department of Revenue.

. It further avers (a) that the production of the evidence would be in violation of the provisions of section 731 of The Fiscal Code of April 9, 1929, P. L. 343, as amended by the Act of July 9, 1941, P. L. 305, 72 PS §731, which prohibits certain disclosures of information contained in tax reports filed with the Commonwealth; (b) that defendant is seeking to conduct a "fishing expedition" among the settlements of shares of approximately 1,000 corporations, and (c) that the

production of the desired reports and related documents would be injurious to the interests of the public and the Commonwealth.

Defendant contends that the tax upon its shares for the year 1934, computed under the Act of 1897, P. L. 292, as amended, was $145,783.65; whereas, if the tax had been computed under the Act of 1907, P. L. 640, as amended, and under the same formula which was applied to State institutions, its tax would have been only $20,158.62, or a difference of $125,625.03.

## Discussion

It goes without saying that if a discrimination, in violation of the Act of Congress, has been applied to defendant, it must have the right to prove that discrimination in the way the law requires, and the court must aid it when such aid is needed to procure the proper evidence.

In 8 Wigmore on Evidence, 3rd ed., 114, there is a discussion as to the origin and use of the subpœna duces tecum, which concludes:

"So the process for documents will be implied wherever testimonial compulsion in general is predicated by a statute."

In Pennsylvania, section 22 of the Act of June 16, 1836, P. L. 784, 17 PS §2079, provides for subpœnas; and in Abernathy v. Pittsburgh Press Co., 47 D. & C. 575 (1943), the court held that the act was a general authority to issue both subpœnas to testify and subpœnas duces tecum, even when required for a pretrial conference.

In American Car & Foundry Co. v. Water Co., 221 Pa. 529, 535, the court discusses the requirement for the issuance of a subpœna duces tecum:

"Anything in the nature of a mere fishing expedition is not to be encouraged. Where the plaintiff will swear that some specific book contains material or important evidence, and sufficiently describes and identifies what he wants, it is proper that he should have it

produced. But this does not entitle him to have brought in a mass of books and papers in order that he may search them through to gather evidence. . . .

"And the fair and proper rule upon the subject is also set forth in 3 Wigmore on Evidence (1904), sec. 2200, where it is said: 'A peculiarity of the subpœna duces tecum is that in the nature of things it must specify with as much precision as is fair and feasible the particular documents desired, because the witness ought not to be required to bring what is not needed, and he cannot know what is needed unless he is informed beforehand.' . . . There must be a 'reasonably accurate description of the papers wanted,' and a showing that it is material in a pending cause; . . . 'The papers are required to be stated or specified only with that degree of certainty which is practicable, considering all the circumstances of the case, so that the witness may be able to know what is wanted of him and to have the papers on the trial, so that they can be used if the court shall then determine that they are competent and relative evidence.' "

In the instant case petitioner has set out exactly what papers he wants and what the papers will show. That is hardly a fishing expedition. If it is the proper way of proving the discrimination which it avers, it is entitled to have the evidence, unless there is some other rule or principle of law which prevents its production.

1. Section 5219 of the Revised Statutes permits States to impose a tax, among other things, upon the shares of National banks, and provides:

"(b) In the case of a tax on said shares the tax imposed shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State coming into competition with the business of national banks: Provided, That bonds, notes, or other evidences of indebtedness in the hands of individual citizens not employed or engaged in the banking or investment business and representing

merely personal investments not made in competition with such business, shall not be deemed moneyed capital within the meaning of this section."

In First National Bank v. Anderson et al., 269 U. S. 341, 70 L. ed. 295, the court said, with reference to the restriction on the taxation of shares (p. 347) :

"1. The purpose of the restriction is to render it impossible for any state, in taxing the shares, to create and foster an unequal and unfriendly competition with national banks, by *favoring shareholders in state banks or individuals interested in private banking or engaged in operations and investments normally common to the business of banking.* (Citing Cases). . . .

"3. *Moneyed capital is brought into such competition where it is invested in shares of state banks* or in private banking. . . .

"4. The restriction is not intended to exact mathematical equality in the taxing of national bank shares and such other moneyed capital, . . . *But every clear discrimination against national bank shares and in favor of a relatively material part of other moneyed capital employed in substantial competition with national banks is a violation of both the letter and spirit of the restriction.* (Citing cases)." (Italics supplied.)

The Act of 1897 imposes a tax on the shares of National banks for the year 1934 by adding together the capital stock, surplus and undivided profits, with a deduction for National bank shares owned and with certain adjustments for appreciation and depreciation. The figure thus obtained was taken to represent the total taxable value of all the shares, and, after a proper deduction was made for shares held by tax-exempt holders, the tax was imposed on the basis of the determined valuation, at the rate of four mills: Commonwealth v. Mortgage Trust Co., 227 Pa. 163; Commonwealth v. Union National Bank of Reading, 51 Dauph. 362; on exceptions 44 D. & C. 47; Commonwealth v. City National Bank of Philadelphia, 52 Dauph. 87;

Commonwealth v. First National Bank of Scranton, 48 D. & C. 399.

However, under the Act of 1907, the tax was imposed upon the shares of trust companies and banks and trust companies for the year 1934, by adding together the capital, surplus and undivided profits, with certain adjustments for appreciation and depreciation, and then deducting from this figure the full value of the National bank and Federal reserve bank shares owned and a portion of the value of the securities of the United States, its agencies and instrumentalities, and the shares of stock of corporations liable to pay or relieved from payment of capital stock, foreign franchise tax or tax on shares to the Commonwealth of Pennsylvania.

The figure thus resulting was deemed to represent the total taxable value of all the shares, and after a proper deduction was made for shares held by tax-exempt holders, the tax was imposed upon the remaining shares on the basis of the determined valuation, at the rate of five mills: Commonwealth v. Provident Trust Co., 319 Pa. 385; Schuylkill Trust Co. v. Pennsylvania, 296 U. S. 113; Commonwealth v. Girard Trust Co., 42 Dauph. 297; Commonwealth v. Schuylkill Trust Co., 327 Pa. 127; Commonwealth v. Union Trust Co., 345 Pa. 298.

Defendant contends that the aggregate tax burden upon the shares of National institutions under the Act of 1897, as amended, at the four-mill rate, is greater than the aggregate tax burden upon the shares of State institutions under the Act of 1907, as amended, at the five-mill rate, because of the allowance of the above-described deductions under the latter act.

2. The taxpayer cannot prove discrimination by the mere reference to the statutes, but must show affirmatively that the system, in fact, discriminates against the holders of National bank shares.

In New York ex rel. Amoskeag Savings Bank v. Purdy, 231 U. S. 373, 391, 58 L. ed. 274, where it was

contended that a State statute imposed the tax on the shares of National and State banks, in violation of section 5219, the court said, with reference to plaintiff's contention (p. 393), that it

"Is based upon no facts of experience or investigation, and amounts to a pure surmise. We do not think it is to be so lightly treated; but, if it were, it still remains to be said that *it was incumbent upon plaintiff in error to show affirmatively that the New York taxation system discriminates in fact against the holders of shares in the national banks, before calling upon the courts to overthrow it; and no such showing has been made.*" (Italics supplied.)

In First National Bank of Shreveport et al. v. Louisiana Tax Commission et al., 289 U. S. 60, 77 L. ed. 1030, the court discussed the burden of proof where discriminatory taxation of national bank shares were involved, saying (p. 64) :

"To establish the invalidity, *it is necessary to prove not only that the plaintiffs were empowered by law and authorized by their stockholders to engage in a competitive line of business, but that, during the tax year, moneys of these national banks were in fact employed in substantial amount in some line of business which was carried on, during the year, by less heavily taxed nonbanking concerns. It is as necessary to prove that the bank's capital was so employed as it is to prove that moneyed capital was actually employed by others in substantial competition with the national banks.* (Citing cases.) For plaintiffs are entitled to the relief against statutes alleged to be unconstitutional only if the statute as applied discriminates injuriously against them. . . ." (Italics supplied.)

In Tradesmens National Bank v. Oklahoma Tax Commission, 309 U. S. 560, 84 L. ed. 947, the court, in discussing the restrictions imposed by section 5219 of the Revised Statutes, said that it was not a valid objection.

*"Unless it appears that the difference in treatment results in fact in a discrimination unfavorable to the holders of the shares of national banks"* p. 567. (Citing cases.)

"Discrimination is not shown merely because a few individual corporations, out of a class of several thousand which ordinarily bear the same or a heavier tax burden, may sustain a lighter tax than that imposed on national banking associations," p. 568. (Italics supplied.)

In Commonwealth v. Union National Bank of Reading, 51 Dauph. 362, defendant contended that it was subject to discriminatory taxation, in violation of section 5219; and, after citing the cases above referred to, we held that defendant had not, with respect to the alleged types of other competing moneyed capital, met the burden of proving that the moneyed capital was competing or was taxed at a lower rate.

Upon exceptions, 52 Dauph. 13 (pages 18 and 19), we again fully discussed the matter, concluding:

*"To establish discrimination, the defendant must show both competition and lower tax burden, which it has failed to do; . . ."* (Italics supplied.)

In Commonwealth v. City National Bank of Philadelphia, 52 Dauph. 87, where defendant had attempted to show both the lack of uniformity and a substantial discrimination by offering a table which showed, among other things, the outstanding number of shares of 14 Philadelphia banks, the sales price per share, bid and asked, and the taxed value per share, together with the total sales price of the shares of each bank, bid and asked, and the total taxable value over or under the mean sales price; we held that such evidence came far short of showing discrimination, and that defendant could not meet the burden upon it by selecting 14 National banks "for a comparison out of the multitude of National banks in the Commonwealth"; citing Tradesmens National Bank v. Oklahoma Tax Commission, supra.

It is apparent from the foregoing authorities that defendant's burden of proof can only be met by developing a State-wide difference in the aggregate tax burden for 1934 upon the shares of State institutions, and showing that certain deductions are allowed only in the computation of the shares of State institutions.

3. Are the National banks and National banks and trust companies in substantial competition with Pennsylvania trust companies and banks and trust companies?

National banks are incorporated under sections 5133 and 5134 of the Revised Statutes of the United States, 12 U. S. C. §§21, 22; and their powers are described in section 5136, as amended, and set forth in 12 U. S. C. §24. They are similar to the powers of banks and banks and trust companies conferred by the Pennsylvania Statute of May 9, 1923, P. L. 173, and in section 1001 of the Banking Code of May 15, 1933, P. L. 624, 7 PS §819-1001.

National banks may secure fiduciary powers from the Boards of Governors of the Federal Reserve System, under the Act of December 23, 1913, c. 6, which are set forth in 12 U. S. C. §248.

The authority for a consolidation of a National bank and State banks and trust companies or a State trust company is found in the Act of November 7, 1918, c. 209, sec. 3, 44 Stat. at L. 1225, as amended, 12 U. S. C. §34a; and the State authority for such consolidations is found in section 1412 of the Banking Code of 1933, P. L. 624, 7 PS §819-1412.

It is apparent from the statutory powers above cited that the National institutions are in competition with the State institutions. Perhaps the court could take judicial notice of that fact, but it is also apparent from judicial decisions.

In First National Bank v. Anderson, 269 U. S. 341, 70 L. ed. 295, the court said (p. 348):

"Moneyed capital is brought into such competition where it is invested in shares of state banks or in private banking; and also where it is employed, substantially as in the loan and investment features of banking, in making investments, by way of loan, discount or otherwise, in notes, bonds or other securities with a view to sale or repayment and reinvestment."

In the case of City of Harrisburg v. Harrisburg Trust Co., 38 D. & C. 638, this court discussed and pointed out the power of State trust companies to do banking business.

It follows that the National institutions are in substantial competition with the State institutions involved in this case. It also follows that, in order to prevail, defendant must show that the tax burden upon the shares of the National institutions is greater than that upon the shares of the State institutions.

4. The petition for the issuance of a subpœna duces tecum avers that the reports and documents which it desires to be brought into court will prove the discrimination it alleges.

The Secretary of Revenue asserts that the production of the reports of shares and related documents would be injurious to the interests of the public and opposed to the best interests of the Commonwealth. He also asserts that the production of the reports wanted would be in violation of section 731 of the Fiscal Code of 1929, P. L. 343, 72 PS §731.

(A) Is the issuance of the subpœna harmful to the public interest?

The Secretary of Revenue relies upon the cases of Gray v. Pentland, 2 S. & R. 23; Appeal of Hartranft et al., 85 Pa. 433; Marks' Appeal, 121 Pa. Superior Ct. 181, and certain opinions of the Attorney General's Department.

In Gray v. Pentland, supra, the matter at issue referred to accusations made to the Governer against a person in office. It was held: "The Governor, to

whom such a deposition is addressed, must exercise his own judgment with respect to the propriety of producing the writing." And that was put upon the grounds of public policy.

Hartranft's Appeal, supra, involved the right of the Court of Quarter Sessions of Allegheny County to subpoena the Governor, the Secretary of the Commonwealth, the Adjutant General, and certain other officials to testify before the Allegheny County Grand Jury, involving labor riots. The case did not involve subpoena duces tecum but the court considered the right to issue that type of subpoena. The court laid great stress upon the high office of Governor, whose duties might be interfered with by making him subservient to the court, and said (p. 450):

"The governor, disavowing any disrespect to the court or its process, has answered that, in consequence of his constant communication with the state forces, now in the field, in the disorderly and riotous districts, his time is fully occupied in the discharge of the duties of his office, and that to leave his post would endanger the interests of the public service. This brings us face to face with the question, whether the executive, or the courts for him, are to determine the character of his official duties and the order in which they may be performed. For instance, is obedience to a subpoena one of his duties, and if so, shall he discharge that duty in preference to that which rests upon him as commander-in-chief? The answer to this question is easy; for if the courts can in any one instance or at the guardianship and tutelage of the courts. To the people, under the methods prescribed by law, not to able; that the Governor cannot thus be placed under performance of his duties, they may do so in every in- the attempt to prove that this proposition is not allow- stance and at all times. We need not waste time in any one time, control or direct the executive in the the courts is he answerable for his doings or misdoings. It is his duty from time to time, 'to give to the General

Assembly information of the state of the Commonwealth', but it is not his duty to render such an account to the grand jury of Allegheny or any other county. Whilst, therefore, the motives of the Court of Quarter Sessions in granting the process before us, are not to be lightly impugned, yet we have no doubt it exceeded its jurisdiction in attempting to interfere with the executive prerogative."

In Marks' Appeal, supra, the question involved was whether the Superintendent of the Bureau of Infectious Diseases of the City of Pittsburgh must comply with a subpœna requiring him to produce in court, *in an action upon an insurance policy, the record of that bureau relating to a certain individual.* The superintendent refused on the ground that to do so would be contrary to the public interest. In reversing the lower court holding the superintendent in contempt, the court said (p. 189, 190):

"But information gathered or received for the preservation of the public health and the prevention of disease is not always and in all cases designed or intended for inspection by the public. It may be contrary to the public interest to allow it to be made public or open to general inspection. As pointed out in the opinion of the Supreme Court of New York and the Appellate Division of that court in McCowan v. Metropolitan Life Ins. Co., supra, the protection of the health of the community involved in securing full and frank disclosure of important information, not subject to divulgence to the general public, from persons afflicted with communicable disease, may outweigh in importance the interests of a private litigant in an action of this character. In the absence of statutory pronouncement on the subject, the officer in charge must be allowed to decide what information so received is proper for publication or general inspection and what should be withheld in the public interest. Information furnished or secured for this purpose does not fall

strictly within the 'public documents' or 'official statements' exception to the Hearsay rule, and may contain matters which the head of the department, in whose custody or control they are kept, deems injurious to the public interest—in which case, Mr. Greenleaf says: 'An inspection will not be granted.' (1 Greenleaf on Evidence, sec. 476). See also, Wigmore on Evidence, Vol. 5, sec. 2377 (2d Ed.)."

The opinion of Deputy Attorney General McNees, Production of State Records in Court, 2 D. & C. 725, dealt with the question whether the Pennsylvania Department of Health is required to produce medical records of patients treated at State clinics or State sanatoria when subpœnaed so to do by a court of record. And his opinion, in effect, advised the department that the officers of that department should, in the first place, determine whether "such records would be inimical to the public welfare; . . . and that if, in your judgment, such records should not be produced, you should make respectful presentation to the court of your opinion in the matter".

Attorney General Reno wrote an opinion to the Secretary of Public Assistance, Public Assistance Visitors and Records, 35 D. & C. 89, on the right of the secretary to delegate to the county boards of assistance authority to make decisions on the question of submitting or withholding subpœnae records. He also advised the secretary that "whether they should be withheld in the public interest is a matter for determination of the officer in charge".

The writer of this opinion rendered two opinions when a Deputy Attorney General (Official Opinions of the Attorney General, 1917-1918, p. 507, and State Department of Health, 27 Dist. R. 510), both to the effect that it was within the discretion of the officer in charge to determine whether the best interests were served by allowing or refusing access, in one instance to birth records, and in the other case whether the De-

partment of Health was required to obey the subpœna of a workmen's compensation referee.

From the foregoing decisions it is plain that two principles are established: (1) That the chief executive officials of the Commonwealth may not be taken from the performance of their official duties, under a subpœna duces tecum, to distant parts of the State; and (2) that the officials may determine, in the first instance, whether essential information filed with the sovereign must be kept confidential, or whether it would be against the public interest to disclose it. But the discretion of the official is not absolute. It is reviewable upon appeal.

The present controversy does not fit in to either of these situations. The subpœna would be addressed to the Secretary of Revenue in Harrisburg to appear at the court there, but there would be no necessity for him to personally appear. He could authorize any qualified taxing officer of his department to produce the documents and supply the necessary information at the trial. So that the principle of Hartranft's Appeal in no wise applies to the instant situation.

As to the second proposition, no confidential information is sought to be disclosed. Defendant is seeking to develop a State-wide principle by the statistics applied to the settlement of the taxes. As defendant suggests, the Secretary of Revenue could identify the listed financial institutions by number and need not be referred to by name; but, so far as being against public policy is concerned, we are at a loss to know what public policy would be disturbed by producing reports of shares for the year 1934. Certainly the financial status of the institutions in 1934 would not afford competitors any information that, in 1947, would disturb the institutions involved. Moreover, the information requested is nothing more than what each institution is required to publish in the public press at least once every year, under section 403 of the Banking

Code of 1933, P. L. 565, as amended, 71 PS §733-403, and as imposed on National banks and National banks and trust companies by 12 U. S. C. §161. So that the information sought as to 1934 is too remote to be protected by public policy or to be kept secret because of competition; and it is not, in any event, secret because of the required publication of the same information in the public press.

Although the evidence could be secured by one subpœna and produced at the court house, within approximately six blocks from the secretary's office, he makes the appalling suggestion that the evidence could be obtained by issuing 983 subpœnas duces tecum, one to each of the institutions scattered all over the Commonwealth, to produce the records in Harrisburg, or to secure an authorization from each of the 983 institutions authorizing defendant to obtain the information from the reports on file in the secretary's office. To say nothing of the time and expense involved, it would be an absurd requirement to send subpœnas all over the State to require either a copy of the reports made for the year 1934 and the supporting documents, or, in the event that no copies were kept, to subpœna the records from which the reports were made. In any event, it offends a sense of judicial propriety to suggest that where the sovereign is attempting to collect alleged illegal taxes, and has within its possession the evidence showing the alleged illegality, that it is not required, in a judicial proceeding, to produce that evidence because of some fanciful suggestion that it is against the public policy or detrimental to the public interest to produce it.

This is not a case in which petitioner is asking to use the records in a collateral matter. The attack is against the Department of Revenue itself, in that it is imposing an illegal tax against petitioner. And how can the illegal acts of the department be proven unless it is shown what the department has done?

The Commonwealth contends that it is against the best interests of the Commonwealth to have a "wholesale removal of approximately 1,000 bank shares tax reports" because it "will cause the officials of the Department of Revenue considerable inconvenience as well as interfere with the orderly disposition of claims of other banks involving their 1934 shares tax settlements". The answer to that is: (1) That the Secretary can not defeat the administration of justice, and uphold his own alleged illegal conduct, by pleading inconvenience to supply the proper evidence; (2) that there is no suggestion before the court that "the orderly disposition of claims of other banks involving their *1934* shares tax settlements" have not long since been made; and (3) there need be no "wholesale removal" of records but only so many may be removed on any one day as can be considered in evidence. Certainly this is no argument that the subpœna would be detrimental to the public interest.

It has been argued that these reports are not public documents. We cannot, for a moment, agree with that contention. They are reports made to the sovereign, pursuant to statutory requirement, from which the sovereign settles a tax against the corporation making the report. The purpose is a public purpose, and the document necessarily a public document.

5. It is contended that the issuance of the subpœna would violate section 731 of the Fiscal Code of 1929, P. L. 343, 72 PS §731. That section provides, inter alia, as follows:

"Any information gained by any administrative department, . . . as a result of any returns, . . . required or authorized under the statutes of the Commonwealth imposing taxes or bonus for State purposes . . . shall be confidential *except for official purposes*." (Italics supplied.)

It makes the violation of the section a misdemeanor.

The purpose of this section is to prohibit voluntary disclosures. It is not intended to defeat justice by

prohibiting the production of necessary records in judicial proceedings.

In Maryland Casualty Co. v. Clintwood Bank, 155 Va. 181, 154 S. E. 492, a subpœna duces tecum was sought to compel the production of certain letters and reports for examination in court. The production was resisted on the ground that the Virginia act provided that such information should be kept confidential. The statutory provision was analogous to section 731 of the Pennsylvania Fiscal Code. The court held (p. 193) :

"These statutory provisions should be construed to relate to information of a confidential nature affecting the business of a bank. *They should be strictly construed, when invoked for the limitation of judicial inquiry, and are subject to the right of every litigant to call for and produce evidence affecting his substantial rights. . . .*

"The latter part of the section prohibiting employees or officers of the State from imparting such information, clearly means the voluntary imparting of such information. . . .

*"It was not intended to impede the administration of justice in the courts by the suppression of pertinent testimony."* (Italics supplied.)

In Bell v. Bankers Life & Casualty Co., 327 Ill. App. 321, 64 N. E. (2d) 204 (1945), suit was brought upon an insurance policy; and one of the issues was whether the insured had misrepresented his age when application for the policy was made. It was contended that the records of the Bureau of Public Welfare were inadmissible because of a section of the statute which was similar to section 731 of the Pennsylvania Fiscal Code. The court said (p. 330) :

"This prohibition was clearly intended to forbid voluntary disclosures but it was never intended to prevent the disclosure of the contents of official documents pursuant to the compulsion of a subpœna where the contents of such documents are pertinent to a legal inquiry."

In an opinion written by Attorney General Todd, addressed to the Commissioner of Banking, In re Schaeffer, 19 Dist. R. 647, where there was a communication from the District Attorney of Allegheny County served upon one of the examiners of the department to produce certain documents, the question was whether it was in violation of the law prohibiting the department from disclosing information. The Attorney General said (p. 648):

"I am of opinion that the prohibition in the Act of 1895 against the wilful divulgence of information obtained by your department in making examinations of financial institutions, does not apply to criminal prosecutions against officials, but, on the contrary, it is your duty, and the duty of your examiners, in proper cases, to facilitate such prosecutions with such information as you may have."

The Banking Code of 1933, P. L. 565, 71 PS §733-302, expresses the public policy of the State with reference to the disclosures of information obtained by the department. It provides:

"A. Neither the secretary, nor any deputy, examiner, clerk, or other employee of the department, shall publish or divulge to anyone any information . . . except when the publication or divulgement of such information is made by the department pursuant to the provisions of this Act . . ., *or when the production of such information is required by subpœna or other legal process of a court of competent jurisdiction*, or when it is used in prosecutions or other court actions instituted by or on behalf of the department." (Italics supplied.)

We are of opinion that the legislature, in section 731, when it provided against the disclosure of information "except for official purposes," had in mind proper judicial proceedings.

Counsel for the secretary referred to several cases which, in our opinion, are not persuasive.

In the case of Bowman v. Montcalm Circuit Judge, 129 Mich. 608, 89 N. W. 334 (1902), the court declined an order to bring into court the tax lists which the property owners were required to furnish the assessors. The court said (p. 611):

"It [the lists] may be used in the first instance by the assessor, and later by the board of review. Whether it could be used in any case in a court of justice we need not now inquire; . . ."

We cannot support the proposition that where the assessor and the board of review may use a list to make an assessment, it should be denied a "court of justice" in order to do substantial justice.

In Brackett v. Commonwealth, 223 Mass. 119, 111 N. E. 1036, the Commonwealth attempted to use original tax returns in defending a claim arising in eminent domain proceedings. The court said of the legislation (p. 126):

"It indicates a legislative determination not only that it shall not be open to general observation, but that it shall not be used for any purpose other than that stated in the statute. Thus its evidential character is also affected. The statute manifests a purpose that such returns shall not be used as evidence in the ordinary case."

We think there is no comparison between the attempt to use tax returns in the Massachusetts case and the effort to prove what it is incumbent upon petitioner in this case to prove.

So, in Matter of People v. Johnson & Co., 213 App. Div. 402, 210 N. Y. Supp. 92, the Attorney General, in condemnation proceedings, sought to obtain franchise tax returns filed by defendant corporation; and the question was whether the words "proper judicial order" authorized the court to make an order of that character for the production of the returns. After referring to what was set forth in items b, c, and d of the statute, the court said (p. 405):

"But in my opinion no 'proper judicial order' can be made except in an event when the integrity of the report itself is attacked or defended as the main, and not as a merely collateral, issue."

In Matter of Manufacturers Trust Co. v. Browne, 269 App. Div. 108, 53 N. Y. S. (2d) 923, the court refused to authorize the introduction into evidence of franchise tax returns filed by 49 corporations for the year 1930 in a proceeding for review of the petitioner's tax. And the court, referring to the provisions of the statute, said (p. 109) :

"Because of the provisions of immunity from disclosure, the demand to produce was refused."

There again the court held that the words "proper judicial order" were not broad enough to include the right to introduce the returns in evidence, but that they were limited to "a proceeding in which the integrity of the report itself is attacked, as, for example, in a criminal prosecution for a crime such as forgery or perjury arising out of a false report."

As before indicated, we are not persuaded that these cases from other jurisdictions properly state the law as it was intended by the Legislature of Pennsylvania.

We are of opinion that when the legislature provided that these reports should be confidential, "except for official purposes," it did not intend to permit the Commonwealth to shield itself behind a public policy rule by alleging that to produce the information was detrimental to the public interest, where no such detriment was shown, and thus to thwart a proper judicial investigation of facts which the taxpayer was required to produce and which the Commonwealth possessed.

We recognize that the conclusion to which we have come is likely to impose a substantial burden upon counsel and upon the court to examine the evidence required to be produced, but we cannot shrink from administering justice because of the burden imposed.

We may, however, suggest that while petitioner could not select a few National and State institutions for the purpose of comparison, such as was done in Commonwealth v. City National Bank of Philadelphia, 52 Dauph. 87, yet counsel for petitioner and the Commonwealth might readily agree on 10 or 15 of each class of institutions which would be representative of the total number, and thus save counsel and the court the labor otherwise involved.

We therefore conclude

(1) That the information requested in the petition of the Mellon National Bank & Trust Company is relevant, material, and necessary to the decision as to whether there is an illegal discrimination against the Mellon National Bank & Trust Company in the imposition of the tax for the year 1934 upon its shares.

(2) That the information sought is specified with adequate particularity, is of a limited nature, and can be presented in such manner that its production will not be injurious to the public, detrimental to the public interest, or in violation of section 731 of the Fiscal Code of 1929, P. L. 343.

(3) That a subpoena duces tecum must issue substantially in the form requested by defendant.

And now, November 26, 1947, the prothonotary is hereby directed to issue out of this court a subpoena duces tecum to the Secretary of Revenue, in the form suggested, and for the documents relating to the institutions named in Exhibits "A" and "B" attached to the petition filed July 23, 1947, by the Mellon National Bank & Trust Company for such subpoenas, unless counsel on both sides agree that the subpoenas shall issue for the documents relating to a limited number of National banks and National banks and trust companies, and State banks and State banks and trust companies, which will be representative of each class, for the purpose of ascertaining the facts in issue.