404 A.2d 410

**COMMONWEALTH ex rel., Dale PLATT**

v.

**Janet L. PLATT, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 4, 1978.

Decided May 18, 1979.

Reargument Denied Aug. 22, 1979.

Petition for Allowance of Appeal Denied Oct. 2, 1979.

278

280

Deborah H. Thomson, Lancaster, for appellant.

William E. Chillas, Lancaster, for appellee.

Before PRICE, SPAETH and WATKINS, JJ.

WATKINS, Judge:

This case comes to us on appeal from the Court of Common Pleas of Lancaster County, Civil Division, and involves appellant's claim that the court below improperly committed her to a hospital for involuntary emergency psychiatric treatment.

On June 3, 1978, the appellant was committed to the Psychiatric Ward of St. Joseph's Hospital in Lancaster for emergency involuntary treatment, pursuant to a petition filed by appellant's husband. On June 7, 1978, a hearing was held before a mental health review officer pursuant to *50 P.S. 7303,* a section of the "Mental Health Procedures Act of July 9, 1976" which Act became effective September 9, 1976. Said Section provides for an informal hearing at which the person who is alleged to be in need of psychiatric treatment is afforded an attorney and which hearing is conducted by a Judge of the Court of Common Pleas or a mental health review officer. At the conclusion of the informal hearing the judge or review officer must make a finding as to whether the person is in need of continued involuntary treatment and if he finds that such treatment is needed he must so certify. Under this section the person may be involuntarily committed until he is no longer "severely mentally disabled or in need of treatment", and in any event the person can be committed for no longer than twenty (20) days unless he is committed pursuant to *50 P.S. 7202 or 50 P.S. 7304, 50 P.S. 7303(h).*

After the June 17, 1978, informal hearing the mental health review officer who heard the testimony issued a certification for extended involuntary treatment for a period of twenty (20) days, the maximum period provided for in the Act. Appellant then appealed to the Lancaster County Court of Common Pleas for review of the certification pursuant to *50 P.S. 7303(g)* which provides for a review of any certification issued by a mental health officer by a judge. On June 12, 1978 Judge Anthony Appel of the Court of Common Pleas of Lancaster County held a hearing and affirmed the certification. On June 13, 1978, appellant filed an appeal to our Court and filed an Application for Stay Pending Appeal on June 14, 1978 with the Lancaster County Court which was immediately denied. A similar Application was denied by this Court on June 26, 1978 by Judge Hoffman.

Appellant raises three issues on appeal, First, she contends that the testimony adduced at the informal hearings was insufficient so as to enable the review officer or the court to order her commitment. Second, she argues that the testimony of her physician at the informal hearing should have been barred as incompetent due to the physician-patient relationship. She also argues that the testimony of her husband at the informal hearing should have been barred due to the principle of inter-spousal immunity.

Taking the last issue first we recognize the principle of inter-spousal immunity, as set forth in *28 P.S. 316* and *28 P.S. 317,* renders incompetent the testimony of one spouse against the other in either civil or criminal proceedings. More specifically *28 P.S. 316* prohibits a spouse from testifying as to "confidential communications" made by one spouse to the other, unless the privilege be waived upon the trial and *28 P.S. § 317* renders one spouse incompetent to testify "against the other" except in certain clearly defined situations such as divorce cases, spouse abuse actions, feme sole trader actions, and criminal actions brought by one spouse against the other for injury to the spouse or children of the spouse who instituted the charges. The public policy sought to be enhanced by the privilege is the preservation of marital harmony and the resultant benefits to society from that harmony. *Hunter v. Hunter,* 169 Pa.Super. 498, 83 A.2d 401 (1951). The issue therefore, is whether allowing a spouse to testify at a mental health hearing relative to the condition of his/her spouse constitutes a violation of the above principles. The answer is that it does not.

A spouse who testifies at a mental health hearing relative to his/her spouse's mental condition is not testifying "against" her. Assuming that he is acting in good faith the very purpose of his testimony is not to do something adverse to his wife but to help her obtain the help that she needs. While the spouse who needs the help may feel that the other spouse is "against" her/him this does not make it so. It is well known that the people suffering from the most severe mental problems are the last ones to admit that they have

problems in that regard and that the first step to overcoming such a problem is to recognize it as a problem. Therefore, a husband or wife who seeks psychiatric help for his/her spouse is no more acting "against" the other spouse than is a parent who insists that his child see a doctor or dentist even though the child deplores such needed treatment. Neither the child nor the person with mental problems understands what is in his best interest.

Of course, if a spouse is acting in bad faith in seeking a commitment of the other spouse he would be subject to the various criminal and civil penalties or sanctions for which the law provides. However, because it might be possible for one spouse to act in bad faith in attempting to get the other spouse committed for mental treatment does not compel us to presume that such is the case and to hold that therefore the petitioning spouse is in an adversary position to the other spouse. To do so would be to elevate into law a presumption that runs counter to the great weight of human experience and takes an extremely pessimistic view of human nature.

As stated above, the basic policy behind the principle of interspousal immunity is to enhance marital harmony. In a mental health proceeding the objectives of that policy are preserved by permitting one spouse to be of help to the other. And who is in a better position to observe psychiatric behaviour on the part of a husband or wife than the other spouse? Many episodes of such behaviour will be witnessed *only* by the spouse and we find it difficult to believe that the Legislature meant to exclude testimony of a spouse which would assist the other spouse in obtaining the necessary psychiatric care when it adopted *28 P.S. 316* and *28 P.S. 317.*

█ Insofar as "confidential communications" are concerned we hold that in adopting *28 P.S. 316* the Legislature did not intend to prohibit a spouse from testifying as to his wife's incoherent mutterings, ravings, or ramblings which do not constitute true communications but which are merely outward manifestations of a severely disturbed mind.

■ Appellant argues that in *Commonwealth ex rel. Finken v. Roop*, 234 Pa.Super. 155, 339 A.2d 764 (1975), this Court held that mental health hearings are adversary proceedings. Such is simply not the situation. In *Roop*, supra, a divided court held that the former Pennsylvania Mental Health Act was unconstitutional because it failed to provide a person with adequate due process guarantees in light of the fact that a person involuntarily committed pursuant to the Act would suffer a curtailment of individual rights. No such argument is advanced here but appellant would interpret that decision as tantamount to turning all involuntary mental health proceedings into adversary proceedings at which a spouse could not testify. As discussed above a spouse who testifies at a mental health proceeding relative to the mental condition of his wife is not automatically placed into a position "adverse" to her and in fact may very well be the strongest and most active protector of her best interests.

Likewise in *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), does not compel a different result. In that case the Court held that juveniles were to be afforded certain due process guarantees at juvenile hearings even though the hearings were termed "civil" proceedings rather than criminal ones. In the instant case there is no question that the proceeding is a civil one even though an involuntary commitment will result in constraints upon a person's freedom. This is so because its purpose is to seek a cure for the person's mental problems and to protect that person and others from the committed person. Unlike a juvenile delinquency proceeding, a violation of the law had nothing to do with commitment under the Mental Health Act. Therefore, we hold that since a spouse who seeks mental treatment for a psychotic husband or wife is not in an adversary position to that spouse, that he or she is competent to testify about the spouse's activities relative to her/his mental condition at a mental health hearing.

■ Appellant's second contention is that the testimony of the psychiatrist who treated the appellant should have been excluded because appellant objected to such testimony

on the grounds of the physician-patient privilege. Prior to the hearing, appellant's attorney had threatened appellant's psychiatrist with civil and criminal sanctions for violating the privilege if the psychiatrist testified at the informal hearing over appellant's objections to that testimony. The physician-patient privilege arises from the *Act of June 7, 1907, P.L. 462, § 1, 28 P.S. § 328* which provides:

"No person authorized to practice physics or surgery shall be allowed, in any civil case, to disclose any information which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity, which shall tend to blacken the character of the patient, without consent of said patient except in civil cases, brought by such patient, for damages on account of personal injuries".

This section does not render incompetent a physician's testimony regarding facts which he learned from his examination or observations of the patient but bars only confidential communications from the patient to the physician. *Massich v. Keystone Coal and Coke Co.*, 137 Pa.Super. 541, 10 A.2d 98 (1940); *Panko v. Consolidated Mutual Insurance Co.*, 423 F.2d 41 (3rd Cir. 1970). Nor does it bar the physician's testimony as to confidential communications between a client and patient in civil proceedings where such communications do not tend to "blacken the character of the patient". *In re Marks*, 121 Pa.Super. 181, 183 A. 432 (1936); *Woods v. Accident Insurance Co.*, 347 F.2d 760 (3rd Cir. 1965). Therefore in order to fall within the scope of the physician-patient privilege the testimony of the doctor must: (1) involve information gathered from communication from patient to doctor and (2) the testimony must tend to blacken the patient's character. Both criteria must be met in order to give rise to the privilege. Appellant cites several cases wherein our courts have recognized that a certain stigma is often attached to one who has had to avail himself of psychiatric help and while we agree with the Lebanon County Court which stated in *Kohr Estate*, 71 D. & C.2d 48 (1976) that: "In this age of enlightenment regarding mental

disorders, it is generally understood that incompetency due to organic and physical causes is something over which no mortal so afflicted has control. Thus, the court sees no stigma here." We need not further discuss the issue here as our Supreme Court has definitively determined that issue when it recently held that, "whatever the meaning of loathsome disease, psychiatric treatment does not evidence the existence of such a condition." *In re "B", Appeal of Dr. Loren Roth*, 482 Pa. 471, 394 A.2d 419 (1978). Since psychiatric treatment does not evidence the existence of a loathsome disease, evidence of such treatment could not blacken the reputation of one who has sought it for only evidence of such a disease would tend to blacken a person's reputation. *Skruch v. Metropolitan Life Insurance Co.*, 284 Pa. 299, 131 A. 186 (1925).

Furthermore the Mental Health Procedures Act itself provides for the testimony of the physician who examined the person to be committed. The Act provides that during the informal hearing . . . "Information relevant to whether the person is severely mentally disabled and in need of treatment shall be reviewed, including the reasons that continued involuntary treatment is considered necessary. Such explanation shall be made by a physician who examined the person and shall be in terms understandable to a layman". *50 P.S. 7303(c)* The Act goes on to provide the patient with the right to confront and question the physician, thus protecting the patient's due process right. Thus the Act *requires* the testimony of the treating physician at the informal hearing and since this Act was adopted subsequent to the Act establishing the physician-patient privilege we must presume that this section (Mental Health Act) takes preference over the statute establishing the physician-patient privilege. *Statutory Construction Act of May 28, 1937, P.L. 1019, Art. 1, 46 P.S. 501 et seq.* The object of all interpretations and constructions of statutes is to ascertain and effectuate the intention of the Legislature and every law is to be construed to effectuate that intent, if possible. *46 P.S. 551.* When two statutes deal with the same things, a

particular provision in one will control when the other statute is silent as to that matter. *Borough of Millersville v. Lancaster Township*, 2 Pa.Cmwlth. 587, 279 A.2d 349 (1971), affirmed, case remanded on other grounds, 447 Pa. 310, 290 A.2d 102. See also, *46 P.S. 563* which provides that if a conflict in two statutes is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision. Because the Mental Health Procedures Act of 1976 was adopted subsequent to the Act establishing the physician-patient privilege, and because *Section 303(c)* of the said Act is a special provision requiring the testimony of the physician who treated the patient, which special provision controls the general physician-patient statute and constitutes an exception thereto we hold that the physician-patient privilege does not render incompetent the testimony of the patient's psychiatrist in a mental health proceeding. We also must recognize that to bar such testimony would defeat the obvious intent of the Legislature in requiring such testimony as a necessary element of a mental health proceeding and would bar the most reliable evidence of the patient's condition. The requirement of testimony of the treating physician is also the strongest guarantee that a spouse will not act in bad faith in attempting to commit a spouse for treatment who does not require it. Appellant would have us bar the testimony of the two people who are in the best position to detect and observe a person's mental disability, i. e. the person's spouse and the person's doctor. Such a result would be ludicrous and would defeat the obvious legislative purpose of the Act.

In addition, the testimony of the physician acts as a check or balance against that of the spouse. Because we have ruled that the specific provisions of the Mental Health Procedures Act take preference over the general ones of the Act establishing the physician-patient relationship and because psychiatric treatment does not evidence the existence of a loathsome disease which would tend to blacken a person's character, we hold that the physician-patient privilege does not apply here.

Appellant also cites *50 P.S. 7111*, a section of the Mental Health Procedures Act of 1976, for the proposition that the physician-patient privilege renders the psychiatrist's testimony incompetent. That section provides that:

"All documents concerning persons in treatment shall be kept confidential and, without the person's written consent, may not be released or their contents disclosed to anyone except:

"(1) . .. .

"(2) . . .

"(3) a court in the course of legal proceedings authorized by this act; and

"(4) . . ."

This section deals with documents. However, contrary to appellant's assertion this section supports the proposition that the physician's testimony is admissible during the informal hearing because the informal hearing is a "legal proceeding authorized by this act". *50 P.S. 7303* and subsection (3) of this section constitutes an exception to the confidentiality rule.

Finally, as discussed above, the Supreme Court of Pennsylvania has decided that the physician-patient privilege does not apply to psychiatric testimony. *In re "B", Appeal of Dr. Loren Roth, supra.* In that case a psychiatrist who had treated a woman whose juvenile son had escaped from a juvenile facility and stolen four automobiles refused to testify relative to the mother's mental condition or to release the hospital records relative thereto at a hearing held to determine whether the juvenile's best interests would be served by placing him with his mother. The psychiatrist was held in contempt and fined for refusing to testify after being ordered to do so by the court. He had refused to testify on the grounds of physician-patient privilege when the mother refused to consent to the release of this information. The court concluded that the physician-patient privilege did not prohibit the disclosure of the records. However, the court did conclude that the testimony concerning her medical records was barred by her right to privacy. How-

ever, the situation in *Roth*, supra, is unlike the one here in that in *Roth* there was no statute involved which explicitly required the psychiatric testimony.

The right to privacy, like every other right, is not absolute. In *Roth*, the basic issue with which the court was concerned was the best interests of the juvenile. The mother's hospital records were only one avenue which the court could explore in determining the child's best interests. Although relevant, the mother's psychiatric records were only one piece of evidence which would aid the court in its ultimate decision. Since other means of determining the child's best interests were available to the trial court our Supreme Court held that the mother's interests in her right to privacy outweighed the interests of the state in determining the juvenile's best interests. Therefore, the Court held that the trial court could not compel Dr. Roth to reveal the mother's hospital records pertaining to her mental condition over her objections because of her right to privacy. In our case, as in any "mental health case", the mental condition of the patient is the essence or gravamen of the proceeding. Determining that condition is the very purpose of the proceeding, and to hold that a psychiatrist is incompetent to testify at an involuntary commitment proceeding would be incongruous indeed. After all it is the psychiatrist who has the training and expertise to determine a person's mental condition. As stated above, it is the psychiatrist whose testimony stands between the patient and an unscrupulous spouse who attempts to commit a person who is not in need of treatment. Were we to hold that a patient could exclude his psychiatrist's testimony in an involuntary commitment proceeding on the grounds of his right to privacy we would effectively be "wiping such proceedings off the books" or else placing these important issues into the hands of laymen who are generally ill-equipped to render opinions or even observations relative to a person's mental state. Needless to say this would serve neither the interests of the patient nor society which has an interest in seeing to it that those of its members in need of treatment for mental disabilities obtain

it. This we refuse to do and therefore hold that in this case the patient's right to privacy must give way to the interests of society in having that person treated. For these reasons we hold that the psychiatrist should have been permitted to testify at the informal hearing.

Appellant's final assertion is that the testimony and evidence adduced at the informal hearing was insufficient so as to enable the review officer or the court to order her commitment. With this contention we agree.

For a person to be subject to involuntary emergency examination and treatment it must be shown at the informal hearing that the person is: (1) severely mentally disabled; and (2) in need of immediate treatment. A person is severely mentally disabled when, as a result of mental illness, the person's capacity to exercise self-control, judgment, and discretion in the conduct of his/her affairs and social relations or to care for his/her own personal needs is so lessened or impaired that he/she poses a "clear and present danger" of harm to others or to himself/herself. *50 P.S. 7301(a). Paragraph (b) of 50 P.S. 7301* goes on to enunciate the standard for determining what constitutes a "clear and present danger" to the person or to others. A clear and present danger to others is presented when the person has within the past thirty (30) days inflicted or attempted to inflict serious bodily harm on another and there is a *reasonable probability* that such conduct will be repeated (emphasis ours). In the instant case, the testimony of the spouse was rather disjointed and unclear due to several factors among which was the fact that the transcript of the proceedings was prepared by a member of the staff of the *appellant's attorney's legal office* (Central Penn Legal Services), from a tape of the proceedings. This was permitted by the trial court as an emergency measure because the appellant had taken an appeal from the review officer's certification and the appeal had to be heard within 72 hours which apparently presented a problem to the court stenographer. While we understand the necessity of a quick transcription of the testimony in such cases we condemn outright the practice of

permitting any party's attorney or his or her staff, co-workers, or employees to prepare the official transcript of any formal proceeding.

Appellant's husband did testify, however, that appellant on one occasion threw a Noxzema jar in the bathroom, broke it and screamed at him. Appellant's son also testified and it is clear from his testimony that appellant had attempted to inflict serious bodily harm upon one of her children within thirty days of the hearing. Appellant had thrown a heavy chair at one of her children and the chair, although it missed the child, smashed upon impact with a wall. Appellant also testified and admitted doing this. The son also testified that appellant had burned some of his brother's belongings in a barrel when she was angry with him, had frequently struck the other children during temper tantrums, and had attempted to strike his sister with a broom. Appellant also admitted this but testified that she did not mean to inflict serious bodily harm on her children. The record also demonstrates that appellant had stolen money from her children and that she had had previous psychiatric commitment. While the above-mentioned acts certainly would be sufficient for a review officer or a court to conclude that the appellant posed a "clear and present danger" to others the court erred in having appellant committed because the only expert evidence presented at the hearing was a certificate labeled "Part II: Physician's Examination" which was attached as part of the original petition for involuntary treatment. This certificate reads as follows:

"Findings: Patient is delusional—thought she had special position in foreign affairs in Washington, D.C. Mood is elevated and inappropriate. She has no insight into the fact that she is ill. Behavior has been irresponsible, and has been danger to herself and others."

The Act, however, provides in *Section 303(c)* thereof that testimony as to the reasons why involuntary treatment is considered necessary is to be produced at the informal hearing. The reasons for such are to be given by a physician

who examined the patient and the patient or his representative has the right, inter alia, to ask questions of the physician at the hearing. *50 P.S. 7303(c)*. The certificate which was attached to the petition does not satisfy the requirement that a physician must give the reasons as to why the involuntary treatment is necessary because the patient was deprived of his right to question the physician. However, appellant's treating physician (the psychiatrist) did appear at the informal hearing and was prepared to give testimony. It was only because of the threat of legal sanctions made to the physician by appellant's counsel that he did not testify as to appellant's condition. Therefore, it might be argued that appellant by her own actions had waived her right to require a physician's testimony at her commitment hearing. This issue we need not decide at this time, however, because the confusing state of the transcript of the hearing, with its many "inaudibles" and the improper method of transcribing the testimony, as discussed above, require that we remand this case to the court below.

For this reason, we remand this case to the court below for further proceedings consistent with this opinion. During any further proceedings appellant's spouse and her psychiatrist shall be permitted to testify fully and completely as the various privileges asserted by appellant are not applicable here.

SPAETH, J., files a concurring and dissenting opinion.

SPAETH, Judge, concurring and dissenting:

I agree that this case should be remanded for an evidentiary hearing to determine whether appellant was properly committed for extended involuntary emergency treatment under 50 P.S. § 7301 *et seq.* (Supp.1978–79). I also agree, but for different reasons explained below, that at that hearing appellant's husband may testify. I disagree, however, regarding the ability of appellant's psychiatrist to testify. Consequently, I concur in part and dissent in part.

On June 3, 1978, appellant was admitted to the psychiatric ward of St. Joseph's Hospital in Lancaster for involuntary emergency examination and treatment pursuant to 50 P.S. § 7302. This section provided that the emergency examination could extend no longer than 72 hours, unless within the 72 hours appellant was admitted to voluntary treatment pursuant to 50 P.S. § 7202, or a certification for extended involuntary emergency treatment was filed pursuant to 50 P.S. § 7303.[1] Appellant was not admitted to voluntary treatment, but within the 72 hour period, Dr. Truman Mast, a physician apparently on the staff of St. Joseph's Hospital, applied for the certification of appellant.

On June 7, 1978, a hearing was held on the application before a mental health review officer, as required by 50 P.S. § 7303(c). Dr. Mast appeared at the hearing but, as the majority notes, did not testify in support of the certification because before the hearing he had received a letter from appellant's attorney stating that appellant was asserting "her privilege against [his] testimony as her treating physician," and that if he testified he would expose himself "to the possibility of civil liability and damages." N.T. 6/7/78 at 2.[2] Dr. Mast stated at the hearing that he had been advised by an attorney for the hospital not to testify except under court order, which evidently was not obtained. Appellant's husband testified that on one occasion appellant had thrown a Noxema jar in the bathroom and screamed at

1. The legislature has recently amended this section to extend the period for involuntary emergency examination and treatment to 120 hours. Act of Nov. 26, 1978, P.L. No. 324, § 302(d), 7 Pa.Leg.Serv. 1094 (1978).

2. The majority's statement that appellant's attorney threatened Dr. Mast with criminal sanctions if he testified at the hearing, see at 414, is without basis in the record. This statement is apparently based on Exhibit A in Appellee's Brief, which is a copy of a letter sent by Community Legal Services to the staff of St. Joseph's Hospital in connection with the commitment hearing of another individual approximately eight months before the hearing involved in the present case. Appellee has not explained the relevance of this letter to this case.

him. The record indicates that he did not testify to further incidents because of repeated objections raised by appellant's attorney attacking the competency and relevancy of his testimony. Appellant's son testified that a week or two before the hearing appellant had hit his sister with a broom, and had thrown a chair at her. The chair did not strike his sister, but it broke upon impact. The son also said that appellant had broken into his room and taken his belongings, and that she had burned some of his brother's clothes in a barrel and struck his brother when he said something about it. N.T. 6/7/78 at 4. This was the extent of the petitioner's evidence against appellant. Appellant testified on her own behalf, and called four character witnesses.

The review officer certified appellant for extended emergency involuntary treatment not to exceed 20 days. On June 9, 1978, appellant petitioned the court of common pleas for review of the certification, as provided under 50 P.S. § 7303(g). A hearing was held on June 12, following which the lower court affirmed the certification. Appellant has appealed from this order.[3]

---

**3.** Appellant states in her brief that she was released from custody on June 27, 1978. Appellant's Brief at 24 n. I agree, however, that her release does not moot her appeal. In *Commonwealth ex rel. Bielat v. Bielat*, 257 Pa.Super. 446, 390 A.2d 1321 (1978), we held that a discharge from involuntary civil commitment does not automatically moot an appeal from the commitment, since under *Wolfe v. Beal*, 477 Pa. 477, 384 A.2d 1187 (1978), a person unlawfully committed to a mental institution has the right to demand that court records of the commitment be expunged and all related hospital records destroyed. Here, appellant asks that we declare her commitment unlawful and order the expungement of her hospital records. *See also Commonwealth ex rel. Finken v. Roop*, 234 Pa.Super. 155, 162 n. 4, 339 A.2d 764 (1975).

Appellee argues that in spite of the relief prayed for by appellant, the appeal is moot because "Mrs. Platt has a history of psychiatric commitments, which lessens the impact of the stigma which might otherwise attach to this particular commitment." Appellee's Brief at 24. While it may be asserted that if an individual has a substantial history of psychiatric commitments, the stigma attached to any one will be slight, and that therefore the individual's interest in having his records expunged of a single illegal commitment is trivial, the record shows only one prior hospitalization of appellant—for three days at St. Elizabeth's Hospital in Washington, D.C., during the first part of 1978—and no subsequent commitments. Also, the record does not

Appellant asserts that the evidence taken by the mental health review officer was insufficient to support her certification for extended involuntary emergency treatment. I agree.

In order to certify appellant, the review officer was required to find that appellant was severely mentally disabled and in need of continued involuntary treatment. 50 P.S. § 7303(c)(1). A person is severely mentally disabled when, as a result of mental illness, he presents a clear and present danger to himself or others. 50 P.S. § 7301(a). In order to find that appellant presented a clear and present danger, the review officer had to find first that within 30 days of the hearing appellant had either inflicted or attempted to inflict serious bodily harm to another. 50 P.S. § 7301(b). *See also Commonwealth ex rel. Gibson v. Gigiacinto*, 261 Pa.Super. 53, 395 A.2d 938 (1978) (HOFFMAN, J., dissenting).[4] No evidence was offered to show that appellant inflicted serious bodily harm on her husband or children; at most, the evidence showed that she inflicted physical harm when she hit her daughter with a broom and struck one of her sons.

show whether the hospitalization was voluntary or involuntary, nor the diagnoses made by the staff at St. Elizabeth's. Under the circumstances, I believe that appellant's interest in the expungement of her records is substantial.

4. 50 P.S. § 7301(b) also provides that clear and present danger may be shown by establishing that a person has either 1) attempted suicide and there is a reasonable probability of suicide unless treatment is afforded under the Act; or 2) mutilated or attempted to mutilate himself severely and there is a reasonable probability that the acts will be repeated; or 3) acted in such a manner as to evidence that he is unable, without care, supervision and the continued assistance of others, to care for himself, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment is afforded under the Act. There was no evidence, however, to show that appellant presented a clear and present danger to herself for any of these reasons.

Also, it should be noted that the recent amendments to the Mental Health Procedures Act provide that clear and present danger may now be shown by establishing that a person has *threatened* to commit one of the enumerated acts, and has acted in furtherance of the threat. Act of Nov. 26, 1978, P.L. No. 324, § 301(b), 7 Pa.Leg. Serv. 1094 (1978).

*Compare* 18 Pa.C.S.A. § 2301 (1973) (defining "bodily injury" and "serious bodily injury" for purposes of the Crimes Code): "Bodily injury"—"Impairment of physical condition or substantial pain"; "Serious bodily injury"—"Bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Thus, the review officer could have found appellant severely mentally disabled only if the evidence established that appellant attempted to inflict such injury. The strongest bit of evidence to establish this attempt was her son's testimony that she struck her daughter with a broom and threw a chair at her. The record, however, does not show how hard appellant struck her daughter, or on what part of the body. (The record does show that no hospitalization was required' as a result of the blow.) Also, although appellant admitted that she threw a chair at her daughter, she testified, without contradiction, that she did not throw it directly at her, and was not trying to hit her. N.T. 6/7/78 at 11. Moreover, the record is devoid of any reference to threats made by appellant against her family,[5] and there was testimony that appellant was goaded by her children, so that some reprimand by appellant against them may have been warranted. (For example, one of appellant's sons admitted that he told appellant that she was "nuts." N.T. 6/7/78.)

Furthermore, even if we were to assume that the evidence was sufficient to show that appellant attempted to inflict serious bodily injury on her daughter, the evidence was still insufficient to show that the attempt resulted from mental illness, or that there was a reasonable probability that appellant's conduct would be repeated. No expert psychiatric testimony was taken on this point,[6] and the incidents

5. At one point appellant's husband did state: "In other words, you want her out of this hospital and back to the kids and threaten the kids again." N.T. 6/7/78 at 3. However, he did not say that "again" referred to any incident except the incidents that have been described.

6. As noted above, Dr. Mast, appellant's treating psychiatrist, declined to testify at the hearing before the review officer. Thus, the

related by appellant's husband and son did not by themselves establish the point.

Because the evidence was insufficient, appellant's certification for extended involuntary emergency treatment cannot stand. Nevertheless, because of procedural errors that occurred below, appellant is not entitled to relief on the present state of the record. The majority mentions that the transcript for the hearing before the review officer was prepared by a person associated with the office of appellant's counsel. In addition, it appears that appellant was at least partly responsible for the absence of her husband at the June 12 hearing before the lower court. After the hearing before the review officer, appellant's counsel was directed by the court to serve appellant's husband with notice of the hearing to be held by the court on June 12. Counsel complied by mailing notice and also telephoning the husband. It is admitted, however, that when the husband asked over the telephone whether his attendance would be required at the hearing, counsel responded that he need not attend. Appellant's Reply Brief at 15. This was probably a thoughtless inadvertence, but its effect was that the husband went on vacation and was therefore unavailable to be called as a witness either by the attorney representing the Lancaster County Office of Mental Health and Mental Retardation or by the court. Under 50 P.S. § 7303(g) the court was allowed to receive new evidence in support of the review officer's certification. It may be that had appellant's husband attended the hearing, and had the court desired to receive his testimony, the insufficiency of the present record would not exist. Finally, appellee's counsel asserts that he received improper notice of the June 12 hearing, and was unable to prepare his case. Given the irregularities just discussed, it is unnecessary to decide this issue, but it further

only psychiatric diagnosis of appellant that appears in the record is found in the request for appellant's certification for extended involuntary emergency examination, filed by Dr. Mast with the lower court. That diagnosis, however, consisted entirely of conclusory language, and being an opinion without a factual foundation, was insufficient to establish that appellant was severely mentally disabled.

illustrates the need for a new hearing at which the merits of appellant's commitment may be developed in a proper fashion.[7]

–2–

This Commonwealth has long recognized an evidentiary privilege prohibiting spouses from testifying against each other in judicial proceedings. 28 P.S. § 317 (1958)[8] provides:

> Nor shall husband and wife be competent or permitted to testify against each other, except in proceedings brought by a wife to be declared a feme sole trader, and except also in those proceedings for divorce in which personal service of the subpoena or of a rule to take depositions has been made upon the opposite party, or in which the opposite party appears and defends, in which case either may testify fully against the other, and except also that in any proceeding for divorce either party may be called merely to prove the fact of marriage.

The majority maintains that one spouse is not barred from testifying in favor of the other spouse's commitment by virtue of this statute because "[a] spouse who testifies at a mental health hearing relative to his/her spouse's mental condition is not testifying 'against' her." at 413. This is so, the majority says, because a "person with mental problems [does not understand] what is in his best interests." *Id.* This reasoning begs the question, which is whether appellant *is* a "person with mental problems." Whether a person has

7. Appellee has asked that we direct the lower court on remand to inquire into the propriety of Central Pennsylvania Legal Services appearance for appellant in this case. Appellee asserts that the lower court appointed other counsel to represent appellant, and that Legal Services, which was never appointed by the court, has been improperly representing appellant. However, the propriety of Legal Services' appearance is irrelevant to the propriety of appellant's civil commitment—the issue that has been raised on appeal. Assuming that improper representation by Legal Services presents a justiciable issue, and assuming further that its representation in the present case was improper, and that appellee has standing to bring suit, redress will nevertheless have to be secured in a separate action that properly raises the issue.

8. Act of May 23, 1887, P.L. 158, § 5, cl. (c); 1927, May 10, P.L. 861, No. 439, § 1.

a mental problem is not established until *after* the hearing; whether one spouse may testify against the other must be decided *before* the hearing. The majority, apparently, does not recognize that one spouse may in good faith *believe* that the other spouse has a mental problem, but be entirely wrong. In such an instance, it is incontrovertible that the one spouse, if allowed to testify, would be testifying against the other spouse. The majority offers no solution for this dilemma, which has been created by its reasoning, nor, I suggest, can it. Here, the husband sought the involuntary commitment of his wife, and the wife opposed him, seeking instead of commitment her liberty. The issue being joined in a legal proceeding, the husband and wife became adversaries in the truest sense. *Cf. Commonwealth ex rel. Finken v. Roop*, 234 Pa.Super. 155, 339 A.2d 764 (1975); *In re Ballay*, 157 U.S.App.D.C. 59, 482 F.2d 648 (1973) (civil commitment proceedings are adversary in nature and closely analogous to criminal proceedings).

Still, I should not bar a spouse's testimony in commitment proceedings, for in my opinion, the Legislature has traditionally recognized that in such proceedings, an exception to inter-spousal immunity exists. The Mental Health Procedures Act is somewhat ambiguous as to who may file a petition requesting court-ordered involuntary treatment for another,[9] but the Mental Health and Mental Retardation Act of 1966, which preceded it, was more specific; it provided:

> Whenever a person is believed to be mentally disabled, and in need of care or treatment by reason of such mental disability, . . . a petition may be presented to the court of common pleas of the county in which a person resides or is, for his immediate examination or commitment . . . .
>
> (1) The petition may be made by a relative, guardian, friend, individual standing in loco parentis . . . .

---

**9.** *See* 50 P.S. § 7304(c)(1): "*Any responsible party* may file a petition in the court of common pleas requesting court-ordered involuntary treatment for any person not already in involuntary treatment . . ." (Emphasis added.)

(2) The petition shall set forth the facts upon which the petitioner bases his belief of mental disability and the efforts made to secure examination of the person by a physician.

Act of Oct. 20, 1966, Special Sess. No. 3, P.L. 96, art. IV, § 406, 50 P.S. § 4406 (1969).

The 1966 Act was preceded in turn by acts that were ultimately based, in part, upon the Act of June 13, 1836, P.L. 586. The 1836 Act provided that a lunacy commission could be ordered "upon the application, in writing, of a relative, by blood or marriage, of the person therein named, or a person interested in his estate [provided that] such application be accompanied by affidavits of the truth therein stated." See In re Harner, 18 Pa.Dist.Reps. 395 (1907); In re Lunacy of Madden, 13 Pa.Dist. Reps. 658 (1904). Case law under the 1836 Act held that one spouse could be the petitioner in a proceeding to establish the incompetency of the other spouse. Commonwealth v. Metz, 5 Pa.Dist.Reps. 301 (1896); In re Smith, 17 Legal Intelligencer 332 (Pa.C.P. 1860). Thus, before the act providing for inter-spousal immunity was enacted, in 1887, the Legislature had recognized that one spouse could be the petitioning party in an action to commit the other spouse. I see nothing in the more recent acts that manifests a legislative intent to limit this traditional right.[10]

Of course, it may be argued that all of these provisions address only the ability of a spouse to bring a petition for commitment, and not the ability to testify at the commit-

---

10. Also, it is relevant to note that the Incompetents' Estates Act of 1955 provided that a petition to have a person declared incompetent and a guardian appointed could be brought by "the alleged incompetent's spouse, a relative, a creditor, a debtor or any person interested in the alleged incompetent's welfare." Act of Feb. 28, 1956, P.L. (1955) 1154, art. III, § 301; 1957, July 11, P.L. 794, § 1; 1961, July 14, P.L. 634, § 1; 1967, Oct. 9, P.L. 390, No. 175, § 1, 50 P.S. § 3301(a) (1969) (emphasis added). This provision has since been repealed; the present act provides that "[t]he petitioner may be any person interested in the alleged incompetent's welfare." Act of Dec. 10, 1974, P.L. 867, No. 293, § 11, 20 Pa.C.S.A. § 5511 (1975). It is apparent that this changed provision has not narrowed the class of persons who may bring incompetency proceedings, at least, not so as to exclude a spouse.

ment proceeding. *Cf. Commonwealth v. Barr*, 25 Pa.Super. 609 (1904) (husband permitted to make a criminal information against his wife's alleged seducer even though he would be prohibited from testifying at the trial). Although my research has failed to uncover any case addressing the issue of whether a spouse may testify at a commitment proceeding, given the fact that traditionally the petitioner in an insanity proceeding is the only necessary party to the proceeding, *see* 44 C.J.S.—*Insane Persons* § 15(b) (1945), it seems to me a remote possibility that the Legislature intended that in a commitment proceeding a spouse could be a competent petitioner but would be an incompetent witness.

My conviction that the Legislature has always intended to allow spouses to testify at commitment proceedings is strengthened by additional considerations.

First, subsequent to appellant's commitment, the Legislature amended the Mental Health Procedures Act to provide that at the hearing for extended involuntary emergency treatment under section 7303, "[t]he judge or mental health review officer may review any relevant information even if it would be normally excluded under rules of evidence if he believes that such information is reliable." [11] This amendment, with its broad language, indicates, I believe, a legislative policy to allow spouses to testify in commitment proceedings.[12]

11. Act of Nov. 26, 1978, P.L.No. 324, § 303(c), 7 Pa.Leg.Serv. 1095 (1978).

12. I acknowledge that it could be argued that this amendment is addressed only to the admission of "relevant," not "incompetent," evidence, in other words, that since 28 P.S. § 317 renders spouses not "competent" to testify against each other, the amendment does not affect the application of inter-spousal immunity in commitment proceedings. For me, however, the key word in the amendment is "reliable." If the evidence is reliable, and probative of the issues being litigated, then the amendment allows it to be introduced, even though it would be normally excluded under the rules of evidence. Testimony by spouses is incompetent not because it is not reliable— as a general rule it is as reliable as other testimony—but because extra-legal policy considerations have persuaded the Legislature to bar it from judicial proceedings in certain instances.

Second, the Legislature has carved out exceptions to inter-spousal immunity in proceedings comparable to civil commitment. For example, 19 P.S. § 683 (1964), the counterpart to 28 P.S. § 317 in criminal proceedings, provides that neither husband nor wife shall "be competent or permitted to testify against each other, or in support of a criminal charge of adultery alleged to have been committed by or with the other, except . . . in any criminal proceeding against either for bodily injury or violence attempted, done or threatened upon the other, or upon the minor children of said husband and wife, or the minor children of either of them, or any minor child in their care or custody, or in the care or custody of either of them, each shall be a competent witness against the other . . . ." Thus, in a criminal case where one spouse is charged with assaulting the other spouse or children, the other spouse may testify as to the assault. In the present case, appellant was charged with assaulting her children. Had the Commonwealth brought a criminal action based upon these assaults, her husband would have been competent to testify. Instead of criminal proceedings, civil commitment proceedings were brought. I see no reason to say that the Legislature intended that a spouse could testify in a criminal case of family violence but not in a civil commitment proceeding, the purpose of which is generally believed to be more salutary. Also, the Legislature allows spouses to testify against each other in divorce proceedings. *See* 28 P.S. § 317. Divorce may be predicated on the same acts of family violence as may serve as the basis for a spouse's civil commitment.[13] I believe that this exception, as well as the exception in 19 P.S. § 683, demonstrates a desire by the Legislature to limit inter-spousal immunity in situations where testimony by spouses is essential to the

---

13. 23 P.S. § 10 (1955) provides that one spouse is entitled to a divorce if the other spouse:

    (e) Shall have, by cruel and barbarous treatment, endangered the life of the injured and innocent spouse; or

    (f) Shall have offered such indignities to the person of the injured and innocent spouse, as to render his or her condition intolerable and life burdensome . . . .

protection of family members. In many instances, as the majority notes, intra-familial acts of violence and emotional disturbance will be witnessed only by the person's spouse. The need for the spouse's testimony in such instances is no less in the commitment context than in the divorce or criminal context.

Finally, "the scope of privilege should, in case of doubt, be strictly confined." McCormick, Evidence § 86 (Cleary ed. 1972). *See also Kine v. Forman,* 205 Pa.Super. 305, 309–10, 209 A.2d 1, 3 (1965).

As a corollary to the conclusion that spouses should be allowed to testify in commitment proceedings, I should allow them to testify without regard to the limitations on spousal testimony found in 28 P.S. § 316.[14] I believe that the recent amendment to the Mental Health Procedures Act constitutes an implied repealer of this provision in the area of civil commitments.

–3–

The majority holds that appellant's communications with Dr. Mast, her psychiatrist, are not protected from disclosure by a constitutional right to privacy. at 416–417. However, neither the majority, the lower court, nor either party, has identified the relationship between appellant and Dr. Mast, other than to say that he was her treating psychiatrist, which does not tell us whether appellant was being treated by Dr. Mast *before* her commitment under section 7302, or whether her treatment by Dr. Mast began only *as a result* of

**14.** 28 P.S. § 316 provides:
> Nor shall either husband or wife be competent or permitted to testify to confidential communications made by one to the other, unless this privilege be waived upon the trial.

This provision differs from 28 P.S. § 317 in that it prohibits testimony only as to confidential communications between spouses made while they are married (as opposed to the general prohibition in § 317 barring spouses from testifying against each other at all). However, unlike § 317, the bar in § 316 survives the termination of the marriage by death or divorce. *See generally Commonwealth v. Borris,* 247 Pa.Super. 260, 372 A.2d 451 (1977); *Huffman v. Simmons,* 131 Pa.Super. 370, 200 A. 274 (1938).

that commitment.[15] The distinction is crucial to a proper determination of whether Dr. Mast may testify at the commitment proceedings.[16]

. The exact dimensions of the constitutional right to privacy remain uncertain. However, the right encompasses at least three different interests. "The first is the right of the individual to be free in his private affairs from governmental surveillance and intrusion. The second is the right of an individual not to have his private affairs made public by the government. The third is the right of an individual to be free in action, thought, experience, and belief from governmental compulsion." *Whalen v. Roe,* 429 U.S. 589, 599 n. 24, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977), *quoting* Kurland, *The Private I,* The University of Chicago Magazine 7, 8 (Autumn 1976). Disclosure of appellant's communications with her treating psychiatrist would clearly implicate the second and third of these interests as well as aspects of the first.

When a person enters into a psychotherapeutic relationship with a doctor, he has a legitimate expectation that his communications will be held in confidence, unless informed

**15.** Dr. Mast testified that he is on the staff of St. Joseph's Hospital. N.T. 6/7/78 at 1. His signature also appears in Parts I and III of the application for appellant's certification for extended involuntary emergency treatment. *See* Exhibit D of Appellant's Brief. It would thus seem that he was appellant's treating psychiatrist during her 72 hour involuntary emergency examination, although the record does not show this explicitly. Nevertheless, we still do not know whether Dr. Mast and appellant were in a psychiatrist-patient relationship before appellant's 72 hour commitment, which changed from a voluntary to an involuntary relationship during appellant's stay at St. Joseph's Hospital.

**16.** It should be noted that for purposes of this appeal, it is necessary to address only one of a number of relationships that may exist between a person and a psychiatrist, *i. e.,* the psychotherapeutic relationship where the psychiatrist seeks to treat the mental illness of his patient. For my conception of what a psychiatrist's profession may entail, and the kinds of relationships that could be involved in other cases, *see* 63 P.S. § 1202(3) (Supp.1978–79). This provision deals with the licensing of psychologists, but can serve as a useful reference in disputes involving psychiatrists. *Cf. In re B,* 482 Pa. 471, 394 A.2d 419 (1978) (ROBERTS, J., concurring).

to the contrary by the doctor.[17]  General agreement exists in the legal and medical worlds that confidentiality of communications between patients and therapists is the *sine qua non* of successful psychiatric treatment.  " 'Psychiatrists not only explore the very depths of their patients' conscious, but their unconscious feelings and attitudes as well.  Therapeutic effectiveness necessitates going beyond a patient's awareness and, in order to do this, it must be possible to communicate freely.' "  Advisory Committee on the Federal Rules of Evidence, 56 F.R.D. 183, 241–42 (1973) (citation omitted). "Many physical ailments might be treated with some degree of effectiveness by a doctor whom the patient did not trust, but a psychiatrist must have his patient's confidence or he cannot help him.  'The psychiatric patient confides more utterly than anyone else in the world.  He exposes to the therapist not only what his words directly express;  he lays bare his entire self, his dreams, his fantasies, his sins, and his shame.' "  *Taylor v. United States,* 95 U.S.App.D.C. 373, 376, 222 F.2d 398, 401 (1955) (EDGERTON, J.), *quoting* M. Guttmacher and H. Weihofen, Psychiatry and the Law 272 (1952).  *See also In re B,* 482 Pa. 471, 394 A.2d 419 (1978) (plurality and concurring opinions);  R. Slovenko, Psychotherapy, Confidentiality and Privileged Communications 44 (1966);  Fisher, *The Psychotherapeutic Professions and the Law of Privileged Communications,* 10 Wayne L.Rev. 609, 619–20 (1964);  Note, 10 Loy.L.Rev. 695 (1977).  The United States Supreme Court has long recognized that communications contained in private papers are entitled to special protection from disclosure.  *See Nixon v. Administrator of General Services,* 433 U.S. 425, 529–530, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (BURGER, C. J., dissenting) (collecting cases).  Indeed, such recognition is contained in the fourth amendment to the United States Constitution.  Communications made in the course of a psychotherapeutic relationship are at least as personally revealing as those contained in

17.  For a discussion of the possibility of qualified confidentiality in a psychotherapeutic relationship, *see* Fleming and Maximov, *The Patient or His Victim: The Therapist's Dilemma,* 62 Cal.L.Rev. 1025, 1056–60 (1974).

most private papers; and they are made with an equally legitimate expectation that they will not be made public. " 'It would be too much to expect [patients to confide in psychiatrists without reserve] if they knew that all they say—and all that the psychiatrist learns from what they say—may be revealed to the whole world from a witness stand.' " *Taylor v. United States, supra, quoting* M. Guttmacher and H. Weihofen. *See also* Comments of the Advisory Committee on the Federal Rules of Evidence, *supra.* Thus the very nature of the psychotherapeutic relationship gives rise to the expectation that communications will be held in confidence.

Besides implicating a person's right not to have his private affairs made public by the government, disclosure of communications made in the course of psychotherapeutic treatment implicates the person's right in making certain kinds of important decisions to be free from governmental compulsion or interference. "Communications between a patient and his or her psychotherapist often involve intimate medical problems of family, marriage, motherhood and fatherhood, human sexuality, and almost always concern strong emotional needs of the patient." *Caesar v. Mountanos,* 542 F.2d 1064, 1072 (9th Cir. 1976) (HUFSTEDLER, J., concurring and dissenting), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 804 (1977). These elements of the treatment relationship are themselves zones of privacy recognized by the United States Supreme Court to be protected by the Constitution. *See Carey v. Population Services International,* 431 U.S. 678, 684–85, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Whalen v. Roe, supra* 429 U.S. at 600 n. 26, 97 S.Ct. 869. When a doctor's assistance is necessary for a person to make independent decisions within these zones of privacy, the Supreme Court has been scrupulous to protect the person's relationship with the doctor from unwarranted interference by the government. *See, e. g., Colautti v. Franklin,* 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); *Carey v. Population Services International, supra; Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct.

2831, 49 L.Ed.2d 788 (1976); *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). To the extent that disclosure of confidential communications impairs a person's psychotherapeutic relationship with his psychiatrist, his right to freedom of action within these zones of privacy has been infringed.

These considerations have resulted in judicial recognition that the psychotherapeutic relationship between a patient and a psychiatrist is within the patient's constitutional right to privacy. *See In re B, supra* (plurality opinion); *Ceasar v. Mountanos, supra; Lora v. Bd. of Educ. of City of New York,* 74 F.R.D. 565 (E.D.N.Y.1977); *Tarasoff v. Regents of Univ. of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976); *In re Lifschutz,* 2 Cal.3d 415, 85 Cal.Rptr. 829, 467 P.2d 557 (1970). I should so hold here.

This conclusion, however, is not dispositive of the issue of whether appellant's psychiatrist should have been permitted to testify. Constitutional analysis involves a balancing of competing interests. A court's duty does not end once the individual's interests are identified. The government's interests must also be identified and weighed. *See, e. g., Nixon v. Administrator of General Services, supra* (BURGER, C. J., dissenting). If the government's interests are compelling, the individual's constitutional right to privacy may be required to yield, provided that the government has not employed unnecessarily broad means for achieving its purposes. *Id.* Thus, in *Roe v. Wade, supra,* and in the cases following *Roe,* the Court has held that a woman's right to terminate pregnancy is qualified by the government's interests in safeguarding health, maintaining medical standards, and protecting potential life, and that at some point in pregnancy, these interests become sufficiently compelling to permit the government to regulate or prohibit the decision to terminate pregnancy. Likewise, a person's right to use contraceptives may be required to yield to the government's

interest in prohibiting contraceptives dangerous to health. *Eisenstadt v. Baird, supra* 405 U.S. at 460, 92 S.Ct. 1029 (WHITE, J., concurring). *See also Moore v. City of East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (government may intrude upon traditional family living arrangements if its interests are compelling); *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (fundamental right to marriage may yield to compelling governmental interests).

The Legislature has stated the interests in civil commitment of mentally disturbed persons as follows: "It is the policy of the Commonwealth of Pennsylvania to seek to assure the availability of adequate treatment to persons who are mentally ill . . . ." 50 P.S. § 7102 (Supp.1978–79). To achieve this purpose with regard to persons who may be severely mentally disabled but who decline to submit to treatment, the Legislature allows involuntary commitment. It should be noted, however, that in such instances involuntary commitment, is not simply an exercise of the Commonwealth's *parens patriae* power, arising from its legitimate concern with the welfare of the individual. Where the individual poses a threat to the welfare of others, involuntary commitment constitutes an exercise of the Commonwealth's police powers. *See generally Commonwealth ex rel. Finken v. Roop, supra; In re Ballay, supra; Developments in the Law—Civil Commitment of the Mentally Ill,* 87 Harv.L.Rev. 1190 (1974). Thus, in actuality, the interest of the Commonwealth is not only to provide treatment for mentally ill persons, but to remove persons who pose a clear and present danger to themselves or others to situations where the danger may be avoided.

It is apparent that these governmental interests are compelling. Our inquiry must therefore focus upon the Legislature's choice of means. More specifically, we must ask whether a decision to invade appellant's right to privacy, by holding that her psychiatrist should have been permitted to testify, would represent an unnecessarily broad means of achieving the purposes that the Legislature sought to achieve when it provided for involuntary commitment.

In conducting this inquiry I take as my starting point the belief that if we are to have reasonably accurate decisions, either for or against involuntary commitment, *some* psychiatric testimony is desirable—in other words, that to some degree a psychiatrist should be permitted to disclose communications made by his patient in the course of a psychotherapeutic relationship. No doubt there are some cases where the lay testimony is so overwhelming that it will by itself establish a person's severe mental disability, but in many, if not most, cases this will not be so. Often, the dangerous acts established by lay testimony are too ambiguous to prove that the actor is suffering from a mental illness, and that there is a likelihood that the acts will be repeated. Such, indeed, is the present case. Moreover, even where lay testimony is sufficient to prove that a person was committable initially, that testimony will frequently be insufficient to prove that continued commitment is necessary. This will certainly be true in instances where after commitment, signs of the person's mental illness become concealed to the lay observer. In these instances, psychiatric testimony will be the best, and perhaps the only, evidence on the issue of whether the person has regained his health.

To say that *some* psychiatric testimony may be received at commitment hearings does not complete the inquiry we must make. Since *any* psychiatric testimony would to some degree entail an invasion of the patient's right to privacy, the testimony must be procured in a way that the invasion is minimized, while the Commonwealth's purposes are still served. I believe the Mental Health Procedures Act itself provides procedures by which these objectives may be accomplished.

50 P.S. § 7303(c) states that the explanation of why involuntary treatment is considered necessary "shall be made by a physician who examined the person and shall be in terms understandable to a layman." Although this provision is somewhat ambiguous as to which physicians should give this testimony, I think it clear that the drafters intended that it be given by a physician who examined and treated

the person pursuant to section 7302. Section 7302(b) provides that a person taken to a treatment facility for a 72 hour involuntary emergency examination shall be examined by a physician within 2 hours of arrival in order to determine if he is severely mentally disabled. If it is determined that the person is severely mentally disabled and in need of emergency treatment, treatment shall begin immediately. *Id.* Section 7303(a), which allows the treatment facility to apply to the court of common pleas for a 20 day extended involuntary emergency commitment, states that the application shall give the name of "any examining physician" and state the substance of his opinion regarding the mental condition of the person. I think that implicit in the words "any examining physician" is the notion that the physician shall be a person who is on the staff of the petitioning treatment facility and who has been involved in the examination and treatment of the patient. It follows that the reference in section 7303(c) to testimony by "a physician who examined the person" is to a physician who has been involved with the person's examination and treatment during the 72 hour commitment.

The Mental Health Procedures Act is also ambiguous as to the substance of testimony that may be given by the examining psychiatrist. Section 7111 states: "In no event . . . shall privileged communications, whether written or oral, be disclosed to anyone without [ ] written consent." However, it would seem inconsistently, the same section provides in another paragraph that the documents prepared by the treatment facility concerning persons in treatment may be released to "a court in the course of legal proceedings authorized by this act"; and as just noted, section 7303(c) permits an examining psychiatrist to testify as to whether the patient is severely mentally disabled and in need of continued involuntary treatment. The release of documents to the court and the testimony by the examining psychiatrist will necessarily reveal, directly or indirectly, communications made by the patient to his treating doctors. In light of this inconsistency, I think it may be said that although the Act

permits testimony by an examining psychiatrist and the receipt of records by the court concerning the patient's mental condition, such evidence shall be presented in such a manner that the communications made by the patient are compromised as little as possible. Such a reading of the Act comports with the single purpose of psychiatric testimony at commitment proceedings, which is to give a diagnosis of the patient's mental condition, not to disclose communications made by the patient to the psychiatrist.

This conclusion is supported by the provision of other safeguards to protect the patient's privacy. One safeguard of the patient's privacy is section 7302(c), which provides that upon a person's arrival at the treatment facility for the 72 hour involuntary emergency examination, he shall be informed of the reasons for the examination and of his right to communicate immediately with others. Although this notification of rights should not be confused with the waiver doctrines that have developed in the area of criminal law, see *Commonwealth ex rel. Finken v. Roop, supra,* 234 Pa.Super. at 177 n. 14, 339 A.2d at 775, assuming that the notification is proper and that it informs the patient fully of his status at the facility, he will have been told that the facility has the authority to ask that his commitment be extended beyond the initial 72 hour period. If the patient is capable of understanding this notification, any expectation he might have had that his communications would be held in confidence should be substantially lessened. Indeed, the very fact that his relationship with his doctors has been coerced, and not voluntarily assumed, weakens the reasonableness of any belief that absolute confidence will be maintained. In other context, courts have recognized a distinction between confidences made during voluntary and involuntary interviews, and have been reluctant to recognize that communications made during involuntary interviews are protected by an evidentiary privilege. *See, e. g., Mitchell v. Eyman,* 468 F.2d 856, (9th Cir. 1972); *United States v. Harper,* 450 F.2d 1032 (5th Cir. 1971). Another safeguard of

the patient's privilege is Section 7111, which provides that all treatment records shall be kept confidential, and not released except to a limited number of specified persons. Even though the Act allows for the release of those records in proceedings authorized by the Act, confidentiality is not totally destroyed since the court has the power to conduct the proceedings in private with only the parties and court personnel present, if the patient so desires. *Cf.* 50 P.S. § 7304(e)(4).

Given these safeguards, and the fact that it will be difficult, if not impossible, to reach a proper determination in most commitment proceedings without expert psychiatric testimony, the Legislature has used the narrowest possible means to achieve its purposes. To permit the examining psychiatrist under section 7302 to testify would seem to be the least intrusion upon a patient's right to privacy, since the only alternative would be to introduce psychiatric testimony from another source, which may not be available, or if available might involve an even greater intrusion, since the only possible source of psychiatric testimony other than that based on an involuntary treatment relationship would be testimony based on a voluntary treatment relationship. As noted earlier, where the submission to treatment is voluntary, the patient has a substantial expectation that the confidence of his relationship with the psychiatrist will not be breached. To permit breach would represent an intrusion upon the patient's right to privacy greater than where the relationship was involuntary.

This last point, however, has a double edge: Although the greater expectation of confidentiality in a voluntary setting may justify the introduction of the section 7302 examining psychiatrist's testimony on the ground that it represents the least intrusion upon the patient's right to privacy, this very expectation of confidentiality heightens the requirement that the confidence not be breached except for compelling state reasons. Such reasons will usually be absent, given

that the section 7302 psychiatrist may give the court his diagnosis. It might be claimed that the testimony of a psychiatrist who has engaged in a prior, voluntary treatment relationship with the patient, especially if of substantial duration, would result in better judicial decision-making if received in addition to the testimony of the section 7302 psychiatrist. However, the issue is not whether testimony by the former psychiatrist will be helpful to the fact-finder, but whether his testimony is necessary to achieve the Commonwealth's legitimate purposes. I cannot find such necessity, given the fact that the Legislature has determined that in cases where the patient has had no previous psychiatric treatment, a 72 hour examination will provide sufficient data on which psychiatrists and courts can make a proper determination of whether the patient is in need of further involuntary treatment. I am aware that studies show that psychiatric predictions of dangerousness are, in general, unreliable. *See* Diamond, *The Psychiatric Prediction of Dangerousness,* 123 U.Pa.L.Rev. 439 (1974); Ennis and Litwark, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom,* 62 Cal.L.Rev. 693 (1974). However, I know of no studies that show that better predictions are achieved as a result of voluntary treatment, or that the ability to predict depends on the length of the relationship between psychiatrist and patient.[19] There may be instances where the Commonwealth's interests may be so compelling that the former psychiatrist may be allowed to testify. *Cf. Tarasoff v. Regents of Univ. of California, supra* (psychiatrist knows patient intends to harm another seriously). Such instances, however, will be rare.

Finally, it should be noted that the provision in the Mental Health Procedures Act of safeguards to protect the patient's right to privacy cannot by themselves legitimize testimony

---

19. Of course, there is nothing to prevent the patient from waiving his privacy rights and calling the former psychiatrist himself. *Cf. Commonwealth ex rel. Romanowicz v. Romanowicz,* 213 Pa.Super. 382, 248 A.2d 238 (1968).

concerning confidences made in a psychotherapeutic relationship with a former psychiatrist. As Chief Justice BURGER pointed out in a related context, government employees, even though they may be discreet, are still government employees. Unless a court is to say that compulsory disclosure of private communications is justified by the discreet record of the employees, the interests of the individual cannot be balanced away in the absence of a compelling state interest. *Nixon v. Administrator of General Services, supra* 433 U.S. at 536, 97 S.Ct. 2777. Or, as has been stated elsewhere in slightly different terms:

> The essence of privacy is no more, and certainly no less, than the freedom of the individual to pick and choose for himself the time and circumstances under which, and most importantly, the extent to which, his attitudes, beliefs, behavior and opinions are to be shared with or withheld from others.

> Ruebhausen and Brim, *Privacy and Behavioral Research*, 65 Colum.L.Rev. 1184, 1188–89 (1965), *quoted* in *Lora v. Bd. of Ed. City of New York, supra* at 571.

The patient's interest in choosing the circumstances, if any, under which his confidences are to be divulged to strangers does not evaporate merely because the number of strangers is fewer rather than greater.

Consequently, on remand, I should direct that Dr. Mast might testify on the basis of information obtained as a result of appellant's commitment under section 7302. I should also direct that if Dr. Mast knew appellant prior to her commitment, he might also testify on the basis of information obtained outside his role, if any, as appellant's treating psychiatrist—provided that such information was not obtained as a result of a confidential relationship with appellant, but that he might not testify on the basis of information obtained as a result of a psychotherapeutic relationship that he or any other doctor engaged in with appellant, in which appellant entered voluntary and with the expectation that the confidence of the relationship was absolute.